IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 11-cv-02765-PAB-NYW

DALIP BASANTI,

     Plaintiff,

v.

JEFFREY METCALF, M.D.,
JASON ROZESKI, M.D., and
THE UNITED STATES OF AMERICA,

     Defendants.

_____

### ORDER
_____

The Court presided over a 12-day trial in this medical negligence case, involving the alleged failure to diagnose a spinal cord cyst that caused paralysis in plaintiff Dalip Basanti. The defendants consisted of Dr. Jeffrey Metcalf, Dr. Jason Rozeski, and three physicians employed by the Salud Family Health Center, Dr. Kelet Robinson, Dr. Lorraine Rufner, and Dr. Melissa Beagle (collectively the "Salud physicians"). Plaintiff's claims against Dr. Metcalf and Dr. Rozeski were tried to a jury, which returned a verdict in favor of Dr. Metcalf and Dr. Rozeski. By virtue of the Federally Supported Health Centers Assistance Act ("FSHCAA"), 42 U.S.C. § 233(g) *et seq.*, plaintiff's claims concerning the Salud physicians were brought against the United States and, pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b) and §§ 2671-2680, were simultaneously tried to the Court. The evidence and arguments of counsel raise three principal issues: whether the Salud physicians violated the standard of care in failing to

diagnose the cyst or otherwise conduct further workup on Ms. Basanti's thoracic spine;[1] if so, did any such violations of the standard of care cause Ms. Basanti's paralysis; and, if causation was proved, what damages is Ms. Basanti entitled to receive.  Pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court makes the following findings of fact and conclusions of law.

## I.  FINDINGS OF FACT

1.  On October 28, 2009,[2] a cyst at the first and second thoracic segments of her spine compressed Ms. Basanti's spinal cord sufficiently to cause paralysis from the chest down.  As a result, she has lost use of her legs, control over her bowel and bladder, and sexual function.

### A.  Ms. Basanti

2.  Ms. Basanti was born in 1955 in Punjab, India.  In 1996, Ms. Basanti moved to the United States and, in 2004, became a United States citizen.  She is married to Ranjit Basanti and the couple has two adult children, Sukvir Basanti and Bhupinder "Brian" Basanti.

3.  Ms. Basanti has a college degree.  English is not her native language and she testified at trial through an interpreter.  However, Ms. Basanti took her United States

---

[1]Under Colorado law, the jury must make special findings "determining the percentage of negligence or fault attributable to each of the parties" and properly noticed non-parties.  Colo. Rev. Stat. § 13-21-111.5.  The jury found that the United States of America was negligent, but found that such negligence was not a cause of Ms. Basanti's injuries.  Docket No. 372-1 at 2.  However, the Court did not elect to seat the jury as advisory on plaintiff's claim against the government and therefore will not consider the jury's verdict as advisory.  *See* Fed. R. Civ. P. 39(c).

[2]All dates are references to the year 2009 unless otherwise indicated.

citizenship test in English.  She spoke some English at work in the United States,

including communicating with customers at a liquor store she owned and operated with

Mr. Basanti.  A family member was generally present to provide interpretation

assistance during Ms. Basanti's visits with physicians.  No witness testified that

communication between Ms. Basanti and her treating physicians was impaired when

family members functioned as interpreters during physician visits.

### B.  Medical Facilities

#### 1.  Salud Clinic

4.  The Salud Family Health Center ("Salud" or "Salud Clinic") is located in Fort

Lupton, Colorado.[3]  When a patient visited the Salud Clinic in 2009, a nurse would

generally write the patient's primary complaint on the chart.  After seeing the patient,

the treating physician would typically dictate a full note.  The Salud Clinic did not have

an MRI machine in 2009.  Ms. Basanti's medical records indicate that she first visited a

Salud facility in 1999.

#### 2.  Platte Valley Medical Center

5.  Platte Valley Medical Center ("PVMC") is hospital located in Brighton,

Colorado and, during the relevant time period, was a 70-bed facility.  The hospital's

emergency department had 17 beds.  Walk-in patients were met by an emergency

room technician and moved to a triage room, where the patient's history and vital signs

were obtained.  Patients were then generally taken back to an exam room.  At any

given time, the emergency department was generally staffed by a physician, a nurse

---

[3]Although there are multiple Salud clinics, all references to "Salud" or the "Salud Clinic" refer to the Fort Lupton facility unless otherwise indicated.

practitioner, a physician's assistant, four nurses, a secretary, and two emergency room technicians.  When a Salud patient visited the PVMC ER, the on-call Salud physician would be contacted to see the patient and, if appropriate, to admit the patient to PVMC. In 2009, PVMC had an MRI machine that was generally staffed starting at 7:00 a.m. or 8:00 a.m.

### C.  The Salud Physicians

#### 1. Dr. Robinson

6.  Dr. Robinson is a board certified family physician who has been practicing since 2002.  Since that time she has worked as a physician for the Salud Family Health Centers.  In 2005, Dr. Robinson became the director of the Fort Lupton clinic.  Dr. Robinson estimated that, in 2009, she saw between 20 and 25 patients per day.

7.  Dr. Robinson testified that she generally recalled treating Ms. Basanti at the Salud Clinic.  However, with limited exceptions, Dr. Robinson had no independent recollection of her thought process while treating Ms. Basanti in September and October 2009.  Rather, Dr. Robinson's testimony about what took place during those visits appeared to be based upon her interpretation of Ms. Basanti's Salud records and Dr. Robinson's habit and practice.  However, neither party elicited substantial testimony regarding Dr. Robinson's habit and practice.  Thus, the Court finds that, to the extent Dr. Robinson's testimony about what took place and what she was thinking during Ms. Basanti's Salud visits is unsupported by a reasonable interpretation of the Salud records, such testimony is speculative and generally entitled to lesser weight.

8.  Dr. Robinson did not consider herself to be Ms. Basanti's primary care physician ("PCP") because Ms. Basanti did not always request appointments with Dr.

4

Robinson.  However, Ms. Basanti testified that she considered Dr. Robinson to be her primary doctor.  Whether Dr. Robinson was Ms. Basanti's primary care provider or not has no effect on the standard of care that applies to Dr. Robinson.

### 2. Dr. Rufner

9.  Plaintiff did not call Dr. Rufner as a witness and neither side presented any evidence concerning her background.  Dr. Rufner saw Ms. Basanti once during the relevant time period.

### 3. Dr. Beagle

10.  Dr. Beagle is a board certified family physician and worked for Salud Family Health Centers from September 2008 to June 2011 as an attending physician in the Frederick, Colorado facility.  Ex. A-54.  During that time she had hospital privileges at PVMC.  She treated Ms. Basanti at PVMC on October 27 and 28, 2009.  She admitted to having no independent recollection of treating Ms. Basanti on October 27 and any testimony regarding her thought process on that day is entitled to no weight.

### D.  Expert Witnesses

11.  As relevant to the present claims, the following physicians were endorsed as expert witnesses pursuant to Fed. R. Civ. P. 26(a)(2)(B) and testified at trial:

a. Dr. Michael Rauzzino removed Ms. Basanti's spinal cord cyst on October 29, 2009 and testified for plaintiff as an expert witness in the field of neurosurgery.

b.  Dr. Laurence Huffman testified for plaintiff on the standard of care in both family medicine and emergency medicine.  Dr. Huffman first became board certified in family practice in 1977 and emergency medicine in 1982.

c.  Dr. Mark Deutchman testified for the government on the standard of care in family medicine.  Dr. Deutchman has been practicing family medicine since 1978 and currently teaches family medicine at the University of Colorado School of Medicine.

12.  Plaintiff also called Dr. Lane Bracy and Dr. Celina Tolge as expert witnesses pursuant to Rule 26(a)(2)(C), who generally testified only to those opinions formed during the course and scope of their treatment of Ms. Basanti.

**E.  Anatomy**

***1.  The Spinal Cord***

13.  Dr. Rauzzino was the only expert witness to testify in any detail on the anatomy of the spinal cord.  Thus, his testimony is generally undisputed.

14.  The spine is made up of three areas, called, in descending order, the cervical spine, the thoracic spine, and the lumbar spine.  Each area of the spine is divided into multiple segments.  For example, "T1" refers to a vertebra located in the upper-most segment of the thoracic spine and is located in the upper back, just above the armpits.  "T2" refers to the segment directly below T1.

15.  The spinal cord sits between the disks and the joints and extends from the cervical spine through the thoracic spine and ends in the top part of the lumbar spine.  The spinal cord is housed in a bony canal or tube.  This rigid housing protects the cord from outside harm, but also prevents the cord from expanding beyond its housing.  The

spinal cord contains the dura, a sac filled with spinal fluid.  The dura is highly sensitive.

Most importantly, however, the spinal cord contains fibers, referred to as white and gray

matter, which transmit signals to and from the brain.  White matter contains fibers that

send signals up and down the spinal cord.  Gray matter contains fibers that control

signals at specific segments of the spine.  Nerve roots, which are located at specific

segments between the disks, connect the spinal cord with nerves that run to specific

parts of the body.  The bottom of the spinal cord comes to a point, called the cauda

equina, which contains several nerve roots connecting to nerves running throughout the

legs.  Ex. B-13.

16.  Each segment of the spine and corresponding nerve root has a particular

function.  For example, nerves connecting to the spinal cord at C5-C8 control sensation,

Ex. B11, and function in the arms and hands.  Nerve roots emanating from the base of

the spinal cord control bowel, bladder, sexual function, and most of the nerves to the

legs.  To move a toe, a signal from the brain travels down the cervical spinal cord and

thoracic spinal cord to the cauda equina, where the signal travels through the nerve

root, through nerves in the leg, and triggers muscles in the toe.  The reverse is also

true.  If a toe is pricked with a needle, a signal starts at the toe and travels up through

nerves in the leg, through the spinal cord, and up to the brain where the signal is

processed.

17.  A compressive spinal lesion[4] typically grows slowly over time and can have a

variety of effects depending on its size and location.  Cysts that place pressure on a

---

[4]The term "lesion" can be used to describe tumors, cysts, or infections.

nerve root will cause motor or sensory dysfunction only to the specific area of the body servicied by that particular nerve.  For example, nerves in the thoracic spine run underneath the ribs.  Therefore, a tumor or mass pushing against the nerve root at T2 will often create a loss of sensation across the chest wall.  Conversely, a cyst that places pressure on the spinal cord itself can affect any part of the spinal cord, and corresponding nerves, below the lesion or injury.  As the tumor or mass expands, the spinal cord is pushed back against the surrounding bone.  The tissue that transmits signals up and down the spinal cord then becomes compressed.  A tumor or mass pushing against the spinal cord at T2 can block or affect any part of the body serviced by nerves that connect to the spinal cord at or below the lesion and can cause a loss of motor function from T2 downward.[5]   Thus, a cyst at T2 can cause local numbness across the chest wall and/or a loss of sensation and/or motor function from T2 downward depending upon whether the cyst places pressure on the nerve root, spinal cord, or both.  In either case, the dura is itself sensitive, such that a cyst placing pressure on the dura could produce localized pain over the spinal cord or pain referred throughout the area in which the cyst is located.

18.  If a spinal cord cell has become bruised or injured, it is possible for the cell to recover once the pressure on it is relieved.  If a spinal cord cell dies, it will not grow back or regenerate.  Thus, if a patient enters surgery to remove a compressive lesion and retains some function, the patient would be expected to at least retain that function after surgery.

---

[5]For instance, if the spine was transected at the T1 level, a person would retain functionality above T1, but lose all functionality below.

8

19.  As relevant to spinal cord injuries, Dr. Rauzzino testified that leg numbness comes in two forms: radicular numbness and spinal cord numbness.  Radicular numbness occurs when pressure is placed upon a particular nerve, which causes symptoms only in the particular muscle or area serviced by that nerve.  In order for the entire leg to become numb from radicular numbness, pressure would have to be placed on all of the nerve roots controlling that leg.  On the other hand, spinal cord numbness occurs when pressure is placed on the spinal cord itself and, therefore, a single lesion can cause numbness in the entire leg.

### 2. Back Pain

20.  Back pain is a common occurrence in patients seeking treatment from family physicians and generally has a benign cause, such as minor muscle problems.  In some instances, back pain is caused by something more serious.  In order to differentiate between benign back pain and more serious back pain, medical students are trained to recognize the more concerning signs and symptoms of back pain, often referred to as "red flags."  All family medicine physicians who testified in this case indicated familiarity with the concept of red flags.  Dr. Beagle and Dr. Robinson indicated that this was a concept taught in medical school prior to specialization.

21.  Dr. Rauzzino testified as to the following red flags for back pain:

- Back pain without an inciting event, such as an injury.

- Rapid onset back pain combined with a fever.

- Because injuries to the neck or lumbar spine are much more common, back pain in the area of the thoracic spine can be a red flag.

9

- Back pain with associated symptoms, such as the inability to move an

extremity or numbness in an entire extremity.

None of the expert witnesses in this case appeared to directly dispute Dr. Rauzzino's

opinion that these conditions constitute red flags.  As a result, the Court finds Dr.

Rauzzino credible on this point.[6]

22.   Dr. Rauzzino testified that a physician is trained in medical school to look for

red flags when diagnosing the cause of back pain and, in all instances, to first rule out

the worst possible cause.  However, Dr. Rauzzino also admitted that patients with back

pain do not, as a matter of course, undergo imaging, such as an MRI.  Dr. Deutchman

also addressed the "worst first" concept, but testified that, under some circumstances,

ruling out the worst potential diagnosis is too expensive, invasive, or not reasonable

given the context.  Although plaintiff's counsel attempted to impeach Dr. Deutchman

with his deposition testimony on this issue, the Court finds Dr. Deutchman's deposition

testimony largely consistent with his testimony at trial and credits his trial testimony on

this point.  Dr. Robinson and Dr. Beagle similarly testified that, in most but not all cases,

it is important for a reasonable family physician to attempt to rule out those potential

diagnoses that are more life threatening.[7]  The Court finds that the opinion of Dr.

Rauzzino lacks context the other experts provided and, as such, gives greater weight to

the opinions of Dr. Deutchman, Dr. Robinson, and Dr. Beagle.

---

[6]Additionally, the physicians in this case appeared to agree that, when considering the possibility of a spinal cord injury, the inability to void urine is concerning.

[7]For example, Dr. Robinson testified that leg numbness and pain in the thoracic spine can be red flags indicating more serious underlying pathology, and that, if one or more red flags were present, a neurologic evaluation should generally be done.

### F.  Ms. Basanti's Compressive Cyst

23.  Ms. Basanti had a benign endodermal cyst compressing her spinal cord at T1-T2.  The cyst was a focal compression that markedly displaced the spinal cord.  Dr. Rauzzino could not say precisely how long Ms. Basanti's cyst had been present, but testified that it likely had been present for years.  Dr. Rauzzino described the cyst as large, given its location.  Because the cyst grew so large while Ms. Basanti nevertheless retained motor function, Dr. Rauzzino believed that the cyst grew slowly.

24.  Dr. Rauzzino testified this specific type of cyst is rare.  Before Ms. Basanti, Dr. Rauzzino has never had a patient diagnosed with a endodermal cyst at T1-T2.  Dr. Rauzzino testified that, although the type of cyst found in Ms. Basanti's spine may have been rare, a neurosurgeon commonly treats patients with tumors in the spinal column.  Moreover, pressure against the spinal cord is not an unusual occurrence.

25.  The location of the cyst and corresponding spinal cord compression was apparent, even to the untrained eye, from Ms. Basanti's October 28, 2009 thoracic MRI results.  Dr. Rauzzino testified that the cyst would have been visible on an MRI of the relevant area of the spine anytime between September 20 and October 28.  Dr. Rauzzino's testimony on this point was credible and undisputed.  Thus, the Court finds that, between September 20 and October 28, 2009, Ms. Basanti's cyst would have been visible on an MRI of the thoracic spine.  *See* Ex. 105; Ex. 107.

26.  Dr. Rauzzino testified that, between September 20 and October 27, Ms. Basanti had neurologic deficits associated with her thoracic cyst.  The most definite sign of this, in Dr. Rauzzino's opinion, was Ms. Basanti's pain reported near the shoulder blades. Dr. Rauzzino testified that Ms. Basanti's cyst had a thick wall and no signs of

11

leakage.  Thus, it is more likely that the cyst would cause progressive, rather than fluctuating, symptoms.  The Court credits Dr. Rauzzino's testimony to the extent he offers a general opinion that neurologic deficits associated with the cyst were present during the relevant time period.  However, the exact location of Ms. Basanti's shoulder/upper back pain is, at best, unclear from the record, which undermines Dr. Rauzzino's conclusion that Ms. Basanti's shoulder/upper back pain was attributable to her cyst.  The Court accordingly assigns lesser weight to Dr. Rauzzino's opinion on this point.

27.  Dr. Rauzzino testified that a reasonable neurosurgeon who became aware of the existence of a cyst similar to Ms. Basanti's may not admit a neurologically intact patient to the hospital immediately.  The urgency of the condition would depend upon:

- The patient's signs and symptoms.

- The severity of the patient's neurological deficits, if any.

- Whether the patient had lost the use of a leg, in which case immediate surgery would be advisable.

28.  Dr. Rauzzino testified that if the cyst had been removed before full paralysis, Ms. Basanti would have retained some function.

29.  The Court credits Dr. Rauzzino's undisputed testimony on the following points:

- If Ms. Basanti's cyst had been removed before August 26, she would have retained the ability to walk.

- If Ms. Basanti's cyst had been removed when she was complaining of shoulder pain and leg numbness, she would have likely retained considerable function.

**G.  Medical Visits**[8]

30.  Ms. Basanti's treating physicians, with some exceptions specifically noted below, did not have an independent memory of Ms. Basanti's physician visits.  With limited exceptions, Ms. Basanti did not testify concerning specific physician visits.  Thus, Ms. Basanti's physician visits are reconstructed primarily based upon Salud and PVMC medical records.

### 1.  Medical Visits Prior to September 2009

31.  Ms. Basanti sought treatment for diabetes at various Salud facilities prior to September 2009.

32.  Prior to September 2009, Ms. Basanti saw Dr. Robinson on two occasions:

a.  On July 13, 2007, Ms. Basanti visited Salud for left neck, shoulder, and upper back pain.  Dr. Robinson and a physician's assistant diagnosed Ms. Basanti with muscular neck pain and prescribed Flexeril, a muscle relaxer.  Ex. 1 at p. SF 000064.

b.  On March 4, 2009, Ms. Basanti saw Dr. Robinson, complaining of dryness in the tips of her thumbs and toes.  Dr. Robinson diagnosed Ms. Basanti as having a

---

[8]The Court discusses only those medical visits relevant to resolving Ms. Basanti's claims against the government.

fungal infection and uncontrolled diabetes.  Dr. Robinson also noted the possibility that neuropathy[9] may have been causing Ms. Basanti's itch sensation to present as pain.

33.  The 2007 and 2009 visits appear to be the only times Ms. Basanti saw Dr. Robinson before September 2009.

### 2. *Medical Visits Between September 9, 2009 and October 22, 2009*

### a. September 9, 2009 Salud Visit

34.  On September 9, 2009, Ms. Basanti visited Salud.  A family medicine resident took Ms. Basanti's history.  Ms. Basanti complained of right shoulder pain, at 9 out of 10 on the pain scale, that started three days prior to her visit.  The resident determined that Ms. Basanti's pain was specifically located along the scapula, or shoulder blade, and neck.  Ms. Basanti did not report any injury to her shoulder and denied any extremity numbness or tingling.  Ms. Basanti reported that heat, ice, and massage offered temporary relief.  Ex. 1, p. SF000091.  The resident diagnosed Ms. Basanti with a muscle spasm, recommended a muscle relaxer and ibuprofen, as well as continued heat, ice, and massage.  Ms. Basanti was instructed to return to Salud in two weeks if her condition did not improve.  Dr. Robinson signed the resident's assessment and diagnosis indicating her agreement.

35.  Dr. Robinson testified that, given Ms. Basanti's age, the duration of the pain, and her other conditions, Dr. Robinson would not, at that point, consider Ms. Basanti's pain to be particularly concerning.  Dr. Robinson's testimony on this point was credible

---

[9]Neuropathy is a condition affecting nerves.  Symptoms vary from patient to patient and can include burning or tingling sensations or the total loss of sensation in a person's extremities.  Neuropathy can be caused by a vitamin deficiency or an injury.

and not specifically contradicted by any other expert witness testifying as to the standard of care for family physicians.

**b. September 11, 2009 Visit at Dr. Walter's Office**

36.  Dr. Harry Walter is a family practice physician in private practice.  He is not affiliated with the Salud Clinic.

37.  On September 11, 2009, Ms. Basanti visited Dr. Walter's office, complaining of upper back pain, interfering with sleep.  Dr. Walter's nurse practitioner assessed upper back pain due to sprain, recommended a muscle relaxant, and prescribed Vicodin, a pain medication.  Ex. A-36, p. WAL 00001.

**c. September 17, 2009 Visit at Dr. Walter's Office**

38.  On September 17, 2009, Ms. Basanti returned to Dr. Walter's office.  Ms. Basanti's complaints were the same as on her prior visit to Dr. Walter's office, but with the additional complaint of left leg pain and right arm pain.  Ms. Basanti refused a pain injection.  Dr. Walter prescribed a cold pack and Percocet and directed Ms. Basanti to return to the clinic as necessary.

39.  Dr. Walter testified that, based upon his note, he felt that Ms. Basanti had no abnormal neurologic findings on September 17.

**d. September 20, 2009 PVMC ER Visit**

40.  On September 20, 2009, Ms. Basanti visited the PVMC ER.  She arrived at approximately 2:00 p.m., complaining of left leg numbness present since that morning and moving upwards.  Dr. Metcalf[10] examined Ms. Basanti at approximately 3:00 p.m.

---

[10]Dr. Metcalf is board certified in internal medicine and began working full time in the PVMC emergency department in 1998.

Ms. Basanti indicated that she had been having left leg numbness for five days, pain in her left shoulder for the past week, and left side numbness, all of which became worse that morning.  Dr. Metcalf's patient history also indicated, as relevant here:

- Based upon Ms. Basanti's representation, Dr. Robinson was Ms. Basanti's PCP.

- Ms. Basanti's shoulder pain was located on her right side, between the shoulder blade and spine.

- Vicodin did not improve her condition.

- Ms. Basanti was diagnosed with diabetes approximately five years earlier.

- Ms. Basanti had no trouble walking and no history of any injury or other neck pain.  Ex. 2, p. PVMC000008.

41.  Dr. Metcalf's physical examination revealed that Ms. Basanti did not appear to be in distress, moved all extremities without limitation, and was alert.  Her neck movements were not limited.  She walked normally.

42.  Dr. Metcalf's neurological examination indicated no abnormalities in the cranial nerves.[11]  He did find slightly decreased sensation in the left leg and slight weakness in the left leg, but nothing else abnormal.

43.  The following test results were obtained during her visit:

- A normal EKG.

---

[11]Cranial nerves are the nerves of the head and face.

- A chest x-ray,[12] revealing clear lungs along with bone spurs along her mid and lower thoracic spine, which can cause back pain, which suggested to Dr. Metcalf that Ms. Basanti's pain was musculoskeletal.

- Blood work, indicating to Dr. Metcalf that a heart attack was less likely.

- Urinalysis, which likely ruled out kidney stones.

44.  Dr. Metcalf prescribed Toradol, an anti-inflammatory medicine, and Robaxin, a muscle relaxer.  Roughly 30 minutes after taking this medication, Ms. Basanti reported that her pain had not improved.  Dr. Metcalf then prescribed Fentanyl, a narcotic medication for pain.  At 5:47 p.m. Dr. Metcalf noted that Ms. Basanti's pain and numbness was much improved.

45.  Dr. Metcalf checked the following boxes on his differential diagnosis[13]: "Ischemic CVA," "Cerebral-Cervical Trauma," "Hypoglycemia," "CNS Mass/Tumor," and "PE" (pulmonary embolism).[14]  Ex. 2, p. PVMC000009.  He testified that he also considered the possibility of heart attack, lung infection, kidney stones, musculoskeletal pain, nerve impingement, or nerve problems, such as diabetic neuropathy.  Dr. Metcalf's final diagnosis was back pain and paresthesia.  He testified that a CNS Mass/Tumor was less likely because Ms. Basanti had normal muscle tone, normal gait,

---

[12]The expert witnesses in this case generally agreed that an x-ray will not show a soft tissue tumor or mass.

[13]A differential diagnosis is a list of potential explanations for a patient's signs and symptoms based upon a physician's patient history and physical examination.

[14]A pulmonary embolism describes the occurrence of blood clots in the lungs.

17

no bowel or bladder problems, numbness on one side, and because Ms. Basanti's symptoms improved with a small amount of pain medication.

46.   Although Dr. Metcalf admitted he failed to definitively explain her symptoms, at that point Dr. Metcalf believed that Ms. Basanti could safely be discharged.  Dr. Metcalf verbally instructed Ms. Basanti to follow up with Dr. Robinson in two days and the PVMC nursing staff gave Ms. Basanti written instructions to the same effect.  *See* Ex. 2, p. PVMC000016.   However, Dr. Metcalf did not explain to Ms. Basanti that a spinal cord mass or tumor was a possible explanation for her symptoms.  Dr. Metcalf did not contact Dr. Robinson to follow up on Ms. Basanti's visit or send a copy of his notes to the Salud Clinic.

### e.  September 26, 2009 Salud Visit

47.   Ms. Basanti visited Salud on September 26, 2009, complaining of left leg numbness that began 30 minutes prior to her visit.  Family Nurse Practitioner Eileen Flaherty[15] noted that Ms. Basanti visited the clinic for numbness in her left leg "that occurred spontaneously."  Ex. 1, p. SF000092.  During this visit, Ms. Basanti reported to Nurse Flaherty that she had visited the emergency room within the last week, where a stroke was ruled out.  She said that she injured her back three weeks prior to this visit, but had not had prior back pain or numbness.  Ms. Basanti reported that she was having no loss of muscle strength, but some tingling at night before falling asleep.  The

---

[15]Nurse Flaherty was employed by the Salud system and, in 2009, typically worked at the Fort Lupton Salud facility on Saturdays.

Court finds that Ms. Basanti was experiencing some degree of numbness in her left leg, the precise degree of which is unknown.[16]

48. Nurse Flaherty's physical examination revealed the following:

- Normal deep tendon reflexes, normal left leg strength, decreased sensation, normal range of motion of left leg and good, stable gait, some difficulty walking on her toes.

- Increased upper back pain on the right side, between the scapulae and spasming of the paraspinous[17] in the midthoracic area.

49. It is undisputed that Nurse Flaherty was examining the thoracic area of Ms. Basanti's back; however, the precise location of Ms. Basanti's pain was disputed at trial. Because Nurse Flaherty's liability is not at issue, the question becomes how a reasonable family physician would interpret Nurse Flaherty's description of Ms. Basanti's pain. The expert witnesses generally agreed that pain is often referred from one location to another. Dr. Deutchman was the only family practice physician other than Dr. Robinson who offered a specific interpretation of Nurse Flaherty's note, but his testimony was somewhat inconsistent on this issue.

a. Plaintiff argued that Ms. Basanti's pain was either directly over the thoracic spine and was incorrectly documented or was referred from the thoracic spine to the shoulder. When questioned by plaintiff's counsel, Dr. Deutchman

---

[16]Although plaintiff's counsel interpreted the note as indicating the presence of numbness throughout the entire left leg, the note, by itself, does not compel that conclusion.

[17]The paraspinous describes an area in the upper back, to the side of the spine, but not directly over the spinal cord.

testified that Nurse Flaherty was likely looking at Ms. Basanti's thoracic spine. Dr. Deutchman admitted that, if a family physician were considering spinal cord compression, the thoracic spine would be the most likely location. However, Dr. Deutchman's testimony on this point was brief and plaintiff's counsel did not ask him to elaborate. Thus, the Court does not assign such testimony great weight.

b.   Dr. Deutchman also interpreted Nurse Flaherty's note as describing pain located in the shoulder and upper back, not necessarily localized over the spine. As a result, Dr. Deutchman concluded that Nurse Flaherty was not required to order an MRI of the thoracic spine because Ms. Basanti's upper back pain seemed to present in the shoulder area and Nurse Flaherty's examination of Ms. Basanti's lower back revealed nothing abnormal.

c.   The Court finds that a reasonable family physician could credibly interpret Nurse Flaherty's note as documenting pain traceable to the thoracic spine. However, given the inconsistencies in Dr. Deutchman's testimony on the subject, the Court is unconvinced that such an interpretation is the only reasonable one. Rather, a reasonable family physician could also interpret the note as describing pain traceable to the shoulder or upper back, rather than occurring specifically over the thoracic spine.

50.  Nurse Flaherty diagnosed Ms. Basanti with back pain and neuropathy in the left leg that was intermittent. Nurse Flaherty suggested that Ms. Basanti should be considered for a referral to physical therapy and that further radiological evaluation of the back could be necessary if the pain persisted. Nurse Flaherty noted that Ms. Basanti had a follow-up appointment scheduled for the following Monday. No expert

testified that Nurse Flaherty was required to order an MRI of the thoracic spine at this time.

### f.  September 28, 2009 Salud Visit

51.  On September 28, 2009, Ms. Basanti visited Salud complaining of upper back pain and numbness in her left leg.  Dr. Robinson's note suggests that she perceived[18] Ms. Basanti's complaints to be "pain in her right shoulder as well as back pain in her lumbar spine, which radiates as numbness into her left leg.  She feels that her right arm has become weaker . . . ."  Dr. Robinson noted that Ms. Basanti had visited Salud on multiple occasions.  Ms. Basanti reported that she had been to the PVMC ER for evaluation and that "no studies ha[d] been done."  Ms. Basanti also indicated that the prescribed medications were not helping.  Ex. 1, p. SF000101.  Dr. Robinson did not document any additional patient history during this visit.

a.  During her trial testimony, Dr. Robinson characterized Ms. Basanti's complaints as shoulder pain or pain over the scapula, which Dr. Robinson considered to correspond to the low cervical area.  Dr. Robinson did not indicate that she appreciated Ms. Basanti's pain as attributable to Ms. Basanti's thoracic spine.  The Court gives some weight to Dr. Robinson's testimony on this point inasmuch as it was based on her own habit and practice of charting patient complaints.  However, such testimony was based upon Dr. Robinson's in-court

_____

[18]Dr. Robinson admitted that she had no independent recollection of her thought process during this visit.  As noted above, to the extent Dr. Robinson speculated as to what her thought process was during her treatment of Ms. Basanti on this date, the Court declines to credit such testimony.

interpretation of her note from this visit, not on any specific recollection of what she was thinking at the time.

  b.  Dr. Deutchman characterized Ms. Basanti's pain as located in the lower back and shoulder, with no indication that her pain was over the thoracic spinal cord.  The Court finds that Ms. Basanti reported pain near her shoulder, but not directly over the thoracic spinal cord.

52.  Nurse Flaherty's note concerning Ms. Basanti's September 26 visit was dictated on September 28 and transcribed the next day.  It was therefore not available to Dr. Robinson during this visit.[19]  Ex. 1, p. SF000093.  Despite having the ability to do so, Dr. Robinson did not contact PVMC or Dr. Metcalf for records or information concerning Ms. Basanti's September 20 ER visit.

  a.  In Dr. Huffman's opinion, Dr. Robinson was required to acquire the emergency room records and, if she had done so, would have realized that Dr. Metcalf had not ruled out a spinal cord tumor, which perhaps would have led to more aggressive workup.  Dr. Huffman did not explain the basis for his opinion and, accordingly, the Court assigns it lesser weight.[20]

---

[19]In 2009, Salud physicians would dictate notes and have them transcribed at a later date, typically the day after a visit.

[20]Dr. Huffman testified that Dr. Robinson acted unreasonably by failing to consider another note from Ms. Basanti's Salud medical records, namely, a note from a May 18, 2006 physical therapy session at PVMC.  The therapist noted that Ms. Basanti complained of pain in the neck and across both shoulders.  The therapist found strength deficits in the cervical and scapular stabilizers and recommended continued physical therapy.  *Id.* p. SF000046.

Dr. Huffman testified that the May 18, 2006 note would have prompted a reasonable physician to image the back and possibly perform electro physiologic studies and further diagnosis.  The Court assigns Dr. Huffman's opinion no weight.

b.  When questioned by the government's counsel, Dr. Deutchman testified that Ms. Basanti's statement that "no studies have been done" was sufficient to indicate to Dr. Robinson that Dr. Robinson would not be duplicating any tests done at PVMC and, as a result, that there was no reason to acquire the ER records.  *See* Ex. 1, p. SF000101.  However, this opinion is squarely contradicted by Dr. Deutchman's own testimony when questioned by plaintiff's counsel, where Dr. Deutchman testified that Dr. Robinson had an obligation to get the records from the September 20 ER visit.  Thus, the former opinion lacks credibility.

53.  Dr. Robinson conducted a physical examination of Ms. Basanti on September 28 and found:

- Tenderness over the right shoulder.

- Normal strength and movement of the shoulder joint.  Dr. Robinson did not document Ms. Basanti's strength in any other extremities.

- Palpable tightness of the subscapularis muscles.[21]

- Normal straight leg raises, normal reflexes, and good flexibility.

_____

First, Dr. Huffman did not explain what about this particular record would have prompted a reasonable physician to image the back.  Second, Ms. Basanti did not attend physical therapy follow-up appointments and the records do not indicate that she again visited a physician for those same pain and weakness issues, which suggests that the pain and weakness complained of in 2006 resolved itself.  Dr. Huffman did not explain why this note should have been concerning to Dr. Robinson.  Third, there is no evidence that the pain and weakness Ms. Basanti complained of in 2006 was related to spinal cord compression.  Although Ms. Basanti's cyst may have been present since birth, there was no testimony that neurological symptoms related to Ms. Basanti's cyst would have been present in 2006.

[21]Subscapular muscles are located in the upper shoulder.

23

- No discomfort with palpation of the lower spine.

Ex. 1, p. SF000101.  Dr. Robinson testified at trial that she did not consider these

findings to be neurologically concerning and, although consistent with Ms. Basanti's

symptoms, a compressive lesion on the thoracic spine would not have been high on her

differential diagnosis at that time.  Dr. Robinson was also unconcerned by Ms. Basanti's

complaint of right arm weakness because, when tested, strength in that arm was

normal.  It was not clear that Dr. Robinson had an independent recollection of her

clinical impressions during this visit.  The Court accordingly assigns this testimony little

weight.

54.  Dr. Robinson ordered an x-ray of Ms. Basanti's lumbar spine and shoulder.

Dr. Robinson diagnosed Ms. Basanti with back pain, recommended that Ms. Basanti

continue with pain medications, and told her that the back pain will usually resolve on its

own within six weeks.  *Id.*

a.  Dr. Robinson testified that the multi-level degenerative, or

osteoarthritic, changes revealed by the x-ray could have been an explanation for

Ms. Basanti's back pain.  Dr. Deutchman agreed that the x-ray findings could

explain Ms. Basanti's lower back pain.  Dr. Robinson testified that, in her

practice, pain in the lumbar spine commonly causes a sensation of numbness or

shooting pain down one of the legs.  However, on examination by plaintiff's

counsel, Dr. Robinson admitted that the x-rays appeared normal in that they did

not provide an explanation for the pain and leg numbness that Ms. Basanti

complained of.  Dr. Robinson also testified that normal straight leg raises and a

lack of discomfort in the lower spine lead a physician away from diagnosing leg

numbness as caused by a lower back problem.  Dr. Robinson's testimony is therefore somewhat inconsistent.

55.  Dr. Robinson's note stated: "If there is worsening of symptoms, especially with more objective findings of weakness, I will likely send her for MRI."  Ex. 1, p. SF000101.

    a.  Dr. Robinson testified that she was considering an MRI, as opposed to a CT scan, because an MRI would better reveal soft masses.  Based upon Ms. Basanti's condition, if Dr. Robinson would have ordered an MRI, she would have first ordered an MRI of the lower back and shoulder.  Because Dr. Robinson admitted to having no independent recollection of her thought process during this visit, the basis of this testimony is unclear.  As a result, the Court gives this testimony little weight.

    b.  Dr. Deutchman testified that, based upon Dr. Robinson's note, it appeared that she was considering a lumbosacral MRI.  In Dr. Deutchman's opinion, even when considering the progression of Ms. Basanti's symptoms, Dr. Robinson was not required to order an MRI of Ms. Basanti's thoracic spine during this visit.  In light of the lack of expert testimony to the contrary, the Court finds Dr. Deutchman's opinion credible and assigns it significant weight.

**g.  October 5, 2009 Salud Visit**

56.  Ms. Basanti's October 5, 2009 Salud visit was initiated by Salud staff for the purpose of following up on lab results and other tests ordered during Ms. Basanti's September 28th Salud visit.  Ex. A2, p. 103.  A medical student wrote that Ms. Basanti had no specific complaint and that her shoulder and back pain had improved from ten

out of ten on the pain scale to six out of ten without the use of Vicodin.  The medical student who saw Ms. Basanti wrote: "<u>Diabetic neuropathy</u>: numbness on legs.  Start gabapentin . . . ."  Ex. 1, p. SF000108.  No other history or physical examination was documented.  Dr. Robinson signed the medical student's note and wrote "Also seen by me.  Agree w/ note."  *Id.*  Neither the medical records nor Ms. Basanti's own testimony generally suggest that she made a specific complaint during this visit.

a.  The evidence at trial did not definitively establish what the medical student meant when writing "numbness on legs."  Dr. Robinson's testimony was inconsistent on this point, first admitting that the note indicates numbness present in or on ("on" suggesting skin sensation or perhaps prickliness) both legs[22] and later denying that the note indicates any progression of symptoms.  Dr. Robinson's testimony is therefore not credible.  At trial, plaintiff suggested that this sentence should be interpreted to mean that both of Ms. Basanti's legs were entirely numb, such that Ms. Basanti was experiencing complete numbness consistent with pressure on the spinal cord.  The Court rejects this interpretation of the medical record.  First, such a significant finding would likely be the product of a physical examination, and the note contains no indication that a physical examination was performed.  Second, when questioned by plaintiff's counsel, Dr. Robinson admitted that the note did not list any objective evidence upon which to

---

[22]During a portion of her deposition testimony read at trial, Dr. Robinson testified that numbness in the right leg and left leg on October 5th would represent a significant change from Ms. Basanti's condition at her last Salud visit.  However, as discussed herein, plaintiff failed to present evidence, beyond the medical record itself, upon which to determine the true progression, if any, of Ms. Basanti's leg numbness.

base a diagnosis of diabetic neuropathy.  Thus, plaintiff appears to argue for an interpretation that discredits the first two words of the sentence "Diabetic neuropathy: numbness on legs," yet gives increased meaning and importance to the last three words "numbness on legs."  The Court does not find this interpretation reasonable.  The Court infers from the sentence in question that Ms. Basanti's left leg numbness persisted and that, on October 5, Ms. Basanti was experiencing numbness on her right leg in a manner consistent with diabetic neuropathy – such as a loss of sensation.  The Court will not, however, infer that Ms. Basanti was experiencing complete numbness on both legs.[23]

57.  Dr. Deutchman testified that the improvement in Ms. Basanti's pain, seemingly without the use of pain medications, indicated that Ms. Basanti's problem was improving and that such improvement was not simply due to taking pain medication.  He further stated that this decreased the urgency of doing further evaluation.

58.  Dr. Robinson testified that she did not do a neurologic exam during this visit because Ms. Basanti did not initiate the visit and did not make a specific complaint.  Dr. Robinson's testimony does not appear to have been based upon any independent recollection of the October 5 visit and, as a result, the Court does not credit it as such. Rather, Dr. Robinson appears to have been testifying based upon her interpretation of the note and her habit and practice, which, in this instance, provides some foundation for her testimony.

---

[23]Moreover, Dr. Rufner's note dated October 9, 2009 indicates that Ms. Basanti complained of only left leg numbness.  *See* Ex. 1 at p. SF 000110.

a.  Dr. Deutchman testified that the purpose of this visit was to discuss Ms. Basanti's lab results and was not critical of Dr. Robinson's decision not to do a neurologic exam.  No other family medicine physician testified that the standard of care required Dr. Robinson to perform a neurologic exam during this visit.

59.  Dr. Deutchman testified that, at this point, Dr. Robinson had no reason to order an MRI of the lumbar or thoracic spine.  No other family medicine physician offered an opinion regarding Dr. Robinson's conduct during this visit.

### h.  October 8, 2009 Salud Visit

60.  On October 8, 2009, Ms. Basanti met with a diabetic educator at Salud to discuss her diabetes.  Based upon the legible portions of the note from this visit, it does not appear that Ms. Basanti's neurological symptoms were discussed.

### i.  October 9, 2009 Salud Visit

61.  On October 9, 2009, Ms. Basanti saw Dr. Rufner to request a change in her diabetic medication.  Dr. Rufner's note states: "The patient is still experiencing her left leg numbness, but she has had it worked up at the hospital."  Ex. 1, p. SF000110.

62.  Dr. Rufner's examination revealed no edema in the lower extremities and indicated sensation throughout the lower extremities.  Dr. Rufner concluded that Ms. Basanti's left leg numbness had been worked up extensively and expressed hope that her condition would improve with Neurontin and better glycemic control.

a.  Dr. Deutchman testified that Dr. Rufner was not herself required to work up Ms. Basanti's leg numbness because the visit was for a different issue,

namely, a change in diabetic medication, and because Dr. Rufner was working under the assumption that the leg numbness had already been worked up, even though Dr. Deutchman admitted that, in reality, leg numbness had not been worked up.[24]

b.  Neither side called Dr. Rufner as a witness.  There is no evidence indicating what, if any, basis Dr. Rufner had for believing that Ms. Basanti's leg numbness had been worked up or even what Dr. Rufner meant by "worked up." However, given that this information first appears in the subjective section of Dr. Rufner's note, the Court finds, based on reasonable inferences from the evidence, that Ms. Basanti communicated this information to Dr. Rufner.  There was no expert testimony indicating that Dr. Rufner was not permitted to rely in part on Ms. Basanti's representations.  Although, in hindsight, it is apparent that Ms. Basanti's leg numbness had not in fact been "worked up," plaintiff failed to show by a preponderance of the evidence that Dr. Rufner's belief was unreasonable at the time.

63.  Dr. Robinson's September 28 note was likely in Ms. Basanti's file during her visit with Dr. Rufner; thus, Dr. Rufner had access to it.

a.  Plaintiff's counsel impeached Dr. Deutchman with his deposition testimony that indicated, if Dr. Robinson was not available, Dr. Rufner should have ordered an MRI based upon Dr. Robinson's September 28 note only if Dr.

---

[24]In a portion of his deposition read at trial during plaintiff's case, Dr. Deutchman testified that Dr. Rufner should have gotten records from Ms. Basanti's PVMC ER visit. The Court finds that Dr. Deutchman's deposition testimony on this point impeaches his credibility, but will not receive such testimony as substantive evidence.

Rufner considered the note to be a plan of care.  However, Dr. Deutchman

qualified his answer to indicate that would only be true if Dr. Rufner considered

the note to be a plan of care.

64.   Dr. Deutchman testified to two hypotheticals concerning Dr. Rufner's care:

First, if, on October 9th, Dr. Rufner (1) received Ms. Basanti's PVMC ER record and

saw that CNS/tumor is listed on the differential diagnosis (2) ordered a lumbar MRI (3)

the lumbar MRI is negative and (4) thought a lesion higher up was causing Ms.

Basanti's symptoms, then Dr. Rufner had a responsibility to look at the remainder of the

spine.  Second, if a lumbar MRI on Ms. Basanti was negative, it would have made

sense for Dr. Rufner to proceed with a thoracic MRI.

a.   Dr. Deutchman testified that Dr. Rufner was not obligated, as a

reasonable family physician, to order an MRI of Ms. Basanti's thoracic spine and

his opinion was unchallenged by any other family medicine expert witness.

Accordingly, the Court finds that both hypotheticals lack a sufficient factual

connection to this case and assigns them little weight.

65.   With the exception of Dr. Deutchman, no other expert in family medicine

testified specifically regarding Dr. Rufner's care.  None of the Salud physicians testified

as to whether it would have been typical for them to order an MRI based upon a

suggestion contained in another physician's note.   Dr. Robinson's note does not

specify what area of the body Dr. Robinson contemplated imaging.

**j.  October 12, 2009 Salud Visit**

66.  On October 12, 2009, Ms. Basanti saw Dr. Robinson for a follow-up on back

pain and left-sided numbness.  Dr. Robinson's note states: "At last visit, she was

complaining of left-sided shoulder weakness and numbness going down her left arm. She also continues to have low back pain.  We did x-rays after the last visit and she is here to get those results.  She says that her pain has improved some since the last visit." Ex. 1, p. SF000112.

a.  Dr. Deutchman testified that Ms. Basanti's report of improved pain would be viewed as reassuring.  His testimony on this point was undisputed.

67.  Dr. Robinson admitted that she did not perform a neurologic examination and did not document any other history related to Ms. Basanti's shoulder and neck problems.  Dr. Robinson testified that there was no objective evidence of progressive weakness or other convincing findings that more aggressive testing should be done. She based this opinion upon the review of notes and information from other providers, upon prior examinations, and, supposedly, upon Ms. Basanti's interactions in the exam room.  However, given her lack of memory as to this visit, Dr. Robinson's testimony is given limited weight.

68.  Dr. Robinson's note indicates that she diagnosed most of Ms. Basanti's symptoms as caused by osteoarthritis.[25]   Dr. Robinson recommended NSAIDS, a non-steroidal anti-inflammatory, and physical therapy.  Ex. 1, p. SF000112.  Dr. Robinson testified that her practice was to remind patients to return to the clinic if symptoms worsened.

---

[25]Dr. Robinson's note from this visit goes on to mention "rheumatoid arthritis." Ex. 1, p. SF000112.  However, there was no testimony explaining the relationship, if any, between rheumatoid arthritis and osteoarthritis.

a.  When questioned by the government's counsel, Dr. Robinson said that, based on the labs and x-rays, Ms. Basanti presented a classic picture of a middle aged woman with osteoarthritic changes of her back experiencing back pain.  The Court credits this testimony only to a limited extent since it fails to account for Ms. Basanti's shoulder pain, which Dr. Robinson did not indicate could be explained by osteoarthritic changes.

b.  In regard to this office visit, Dr. Huffman noted that Dr. Robinson did not order an MRI and failed to review the September 28 note suggesting that an MRI might be necessary.  Dr. Huffman appeared to be of the opinion that Dr. Robinson breached the standard of care in failing to order an MRI.  However, Dr. Huffman did not explain what the standard of care required.  For example, it is unclear whether, in Dr. Huffman's opinion, reasonable family physicians must always follow treatment plans contained in their notes; whether, under the circumstances, an MRI should have been ordered if Ms. Basanti's symptoms did not improve; or whether the standard of care required something else entirely. Nor did Dr. Huffman indicate what part of Ms. Basanti's body Dr. Robinson should have imaged.  The Court therefore assigns Dr. Huffman's opinion little weight.

c.  Dr. Deutchman testified that a physician must reevaluate a patient on subsequent visits and is not bound to follow a plan formed in an earlier visit.[26]

---

[26]Although plaintiff attempted to impeach Dr. Deutchman with his prior deposition testimony, the hypothetical question posed to Dr. Deutchman during his deposition was incomplete and phrased generally.  At trial, Dr. Deutchman was asked a more specific question and gave a slightly different answer.

When questioned by the government's counsel, Dr. Deutchman testified that Dr. Robinson was not required to order an MRI of Ms. Basanti's lumbar or thoracic spine because Ms. Basanti's symptoms were not referable to the thoracic area and appeared to be improving.

d.   No other family medicine physician offered an opinion as to whether Dr. Robinson was required to order an MRI of Ms. Basanti's lumbar or thoracic spine at this time.  The Court assigns considerable weight to Dr. Deutchman's undisputed opinion that a physician is not bound by plans formed during earlier visits.  Dr. Deutchman's opinion that Ms. Basanti's symptoms were not referable to the thoracic area, however, is unsupported by the evidence in this case.  In fact, the undisputed testimony was that pressure on the dura can result in the referral of pain to other areas.

**k.  October 15 and 22, 2009 Salud Visits**

69.  Ms. Basanti visited a diabetic educator at the Salud Clinic on October 15 and October 22, 2009.  The diabetic educator's note from October 22, although mostly illegible, appears to state that "[p]ain in legs prevents from exercising or walking."  Ex. 1, p. SF000116.

a.   There was no evidence that Dr. Robinson or Dr. Beagle were aware of either visit or at any point viewed the notes from these visits.  Similarly, there was no testimony indicating that Dr. Robinson or Dr. Beagle would have had access to the notes from these visits.  It is, however, reasonable to infer that the notes from these visits would have, at some point, been placed in Ms. Basanti's Salud records, but it is not clear whether that took place before October 27.

b.  Dr. Huffman testified that, when contacted by Dr. Beagle on October 27 regarding Ms. Basanti, Dr. Robinson was required to review her notes and Ms. Basanti's chart and communicate with Dr. Beagle based upon the information contained within.  Dr. Huffman did not indicate whether information from these visits was among the information Dr. Robinson was required to relay to Dr. Beagle.  No other expert witness was critical of Dr. Robinson or Dr. Beagle for failing to make themselves aware of these visits.

### 3.  October 27, 2009

#### a.  Dr. Rozeski and Dr. Bracy

70.  At approximately 3:30 a.m. on October 27, 2009, Ms. Basanti went to the PVMC emergency department.  Her first contact was with PVMC nurses, who recorded that she was unable to ambulate or stand.  Ex. 3 p. PVMC000028.

a.  Ms. Basanti's blood was drawn at approximately 3:50 a.m.  Ms. Basanti's blood work showed sodium levels outside the normal range, indicating that she was hyponatremic.[27]  Low chloride and potassium levels were also present, indicating a change in Ms. Basanti's electrolytes.  Ms. Basanti's glucose levels of 225 mg/dl were high and well outside the normal range of 70-110 mg/dl.  Ex. 3, p. PVMC000042.[28]

---

[27]Dr. Beagle testified, and the expert witnesses generally agreed, that hyponatremia indicates that a patient has low sodium levels in the blood.  It can cause nausea, vomiting, and general feelings of weakness.

[28]Glucose levels in the body are controlled by insulin, which is produced in the pancreas.  Too much glucose in the body can be harmful and, as relevant here, affect peripheral nerve function.

     b.  At 5:30 a.m., nurses placed a Foley catheter.[29]  Once a Foley catheter is placed it is difficult to evaluate whether the patient can urinate without assistance.

    71.  Ms. Basanti saw Dr. Rozeski,[30] who first examined Ms. Basanti at approximately 4:00 a.m.  Dr. Rozeski noted that Ms. Basanti was complaining of shoulder pain, constipation, weakness, leg tingling, and vomiting.  Ex. 3, p. PVMC000031.  Dr. Rozeski performed a physical examination of Ms. Basanti.  He noted, as relevant here, that she had:

     - Good rectal tone.

     - Sensation in both legs to pinprick and cold.

     - No focal motor or sensory deficits.

     - No abnormal reflexes.

Ex. 3, p. PVMC000032.  Dr. Rozeski ordered a CT scan of the lumbar spine.  A preliminary interpretation of the scan found nothing abnormal.  Ex. 3, p. PVMC000061.

    72.  Dr. Rozeski diagnosed Ms. Basanti with hyponatremia, diabetes, and numbness. Ex. 3, p. PVMC000032.

    73.  Dr. Bracy[31] was the on-call Salud physician during the early morning hours of October 27.  At approximately 5:30 a.m., Dr. Bracy received a call from Dr. Rozeski

---

[29]A Foley catheter is a tube inserted through the urethra and into the bladder.

[30]Dr. Rozeski is a board certified emergency medicine physician who worked full time in the PVMC emergency department between 2008 and 2010.

[31]Dr. Bracy specializes in family medicine.  In 2009, Dr. Bracy was a Salud physician who worked primarily at the Salud facility in Commerce City, Colorado.

that a Salud patient had arrived at the ER.  Dr. Bracy indicated that he would come to the emergency department to examine her.  At approximately 6:30 a.m., Dr. Bracy arrived in the emergency department and conducted a history and physical examination.  Dr. Bracy found that plaintiff was unable to move her right leg and that this condition had developed within the last one to several days.[32]

74.  There was no evidence that Dr. Bracy had access to Ms. Basanti's Salud records during this examination.  Dr. Bracy testified that, in 2009, a Salud physician at PVMC could call the Salud clinic and ask a staff member to look through the chart for specific information.  There was no indication, however, that the Salud records were available at PVMC electronically in 2009.  Dr. Beagle testified that, during business hours, the Salud clinic could have sent the records over upon request, but there was no testimony regarding how long it would have taken for the records to arrive at PVMC.[33]

75.  Both Dr. Bracy and Dr. Rozeski agreed that the standard practice is for an on-call physician to admit a patient when contacted by the ER physician.  Dr. Bracy and Dr. Rozeski have differing recollections of whether Dr. Bracy admitted the patient.

   a.  Dr. Bracy recalled telling Dr. Rozeski that he would examine the patient before agreeing to admit her.  Dr. Bracy felt that Ms. Basanti needed more workup before being admitted to the hospital.  He testified that he did not, at any

---

[32]In 2009, Ms. Basanti's Salud medical records would not have been available to Dr. Bracy or Dr. Rozeski until the Salud Clinic opened at 8:00 a.m.  There is no indication that, in 2009, the Salud records would have been available at PVMC electronically.

[33]The Court takes judicial notice of the fact that it is approximately a twelve mile drive between the Fort Lupton Salud facility and PVMC.

point, agree to admit her.  Dr. Bracy testified that, if he had admitted Ms. Basanti, it was his standard practice to write admission orders and dictate an admission history and physical.  No such orders or notes are contained in the medical records.

b.  Dr. Rozeski, despite admitting that he had very little specific memory of Ms. Basanti's visit, testified that during the phone call Dr. Bracy indicated that he would accept admission of the patient and do an evaluation at the hospital, as is typical for admitting physicians.  Dr. Rozeski's note indicates that, at 5:40 a.m. he was admitting the patient to Dr. Bracy.  Dr. Rozeski's note also states that, at 6:50 a.m., Dr. Bracy saw the patient in the ER, perceived diminished motor function in Ms. Basanti's right leg, and wanted an MRI prior to admission.  Ex. 3, p. PVMC000032.  Dr. Rozeski testified that, if Dr. Bracy did not intend to admit Ms. Basanti, Dr. Bracy failed to inform nurses, Dr. Rozeski, or the incoming PVMC ER physician Dr. James Hogan of that fact.

c.  The admission orders in the medical record state that the patient was admitted to Dr. Bracy.  The admission orders were filled out at 5:56 a.m., before Dr. Bracy examined Ms. Basanti.

d.  The Court finds Dr. Bracy's testimony credible and, as such, the Court finds that Dr. Bracy was operating under a genuine and reasonable belief that he did not admit Ms. Basanti.

76.  After examining Ms. Basanti, Dr. Bracy discussed his findings with Dr. Rozeski and suggested that Ms. Basanti receive an MRI before being admitted.  Dr.

37

Bracy testified that he was considering an MRI of the lumbar spine.  An MRI of Ms. Basanti's brain and lumbar spine was then ordered.[34]

77.  Dr. Rozeski has no independent memory of speaking with Dr. Hogan and testified that he did not speak with Dr. Beagle.  Dr. Rozeski's shift ended at 7:00 a.m.

78.  At 7:20 a.m., Ms. Basanti was taken to the MRI machine.  She returned to the ER at 8:40 a.m. complaining of increased pain in her arms and left side.  Ex. 3, p. PVMC000029.  Radiologist Randy Mount dictated his findings at approximately 8:30 a.m.  Ex. 3, p. PVMC000057-59.  The brain MRI findings were transcribed at 11:11 a.m. and the lumbar MRI findings were transcribed at 12:40 p.m.  *Id.*

79.  Based upon the notes from PVMC nurses, it appears that, at 10:05 a.m., Ms. Basanti was transferred by cart to the hospital floor.  Ex. 3, p. PVMC000029.  At 11:20 a.m., a PVMC nurse noted that Ms. Basanti was experiencing weakness in her right and left legs, but was able to move all extremities.  Ex. 3, p. PVMC000093.

### b.  Dr. Beagle

80.  Dr. Beagle testified that she has no independent memory of Ms. Basanti from October 27, 2009.  Her testimony as to the events of that day are based upon her review of medical records and her habit and practice.

81.  At 7:00 a.m., Dr. Beagle took over for Dr. Bracy as the on-call Salud physician.  Dr. Beagle did not recall speaking with anyone in the emergency department about Ms. Basanti.  Dr. Bracy recalled speaking with Dr. Beagle later in the morning, but neither Dr. Bracy nor Dr. Beagle has a specific recollection of what was discussed.

---

[34]Although Dr. Bracy and Dr. Rozeski disagree as to who ordered the MRI, the disagreement is inconsequential.

Dr. Bracy testified that, because Ms. Basanti was not yet admitted to Salud, he may not have automatically discussed Ms. Basanti with Dr. Beagle.  He also testified that it was likely that he would have mentioned Ms. Basanti and the reason for not admitting her. The Court finds that, had Dr. Bracy been operating under the belief that Ms. Basanti was an admitted patient, he would have discussed Ms. Basanti's condition with Dr. Beagle in additional detail.  The Court therefore cannot find it more likely than not that Dr. Bracy communicated to Dr. Beagle that Ms. Basanti was unable to move her right leg.[35]

82.  The circumstances under which Dr. Beagle came to care for Ms. Basanti are not entirely clear.[36]  Dr. Beagle saw Ms. Basanti at some point after 10:05 a.m. and before 12:15 p.m., likely at approximately 11:00 a.m.   Dr. Beagle testified that it is her general practice, when seeing a patient transferred from the emergency department, to review records and notes from the emergency department.

a.  Dr. Beagle's note makes specific reference to multiple findings contained in Dr. Rozeski's note and the ER records, such as Ms. Basanti's blood sugar level at the time of admission, current medications, CT scan and MRI, and Dr. Rozeski's neurological exam findings.  Ex. 3, pp. PVMC000036-37.  The Court finds that it is more likely than not that Dr. Beagle viewed records and

---

[35]However, as discussed below, Dr. Beagle did have access to Dr. Rozeski's note, which indicated that Dr. Bracy found diminished motor function in the right leg. *See* Ex. 3, p. PVMC000032

[36]Dr. Beagle did not recall how and when she was asked to accept care, yet she also testified that the decision to admit Ms. Basanti to the hospital had already been made by the time she came to care for Ms. Basanti.

notes from the ER, including Dr. Rozeski's note, before dictating her October 27 note.

   b.  Dr. Beagle was presented with the ER records and Dr. Rozeski's note during trial.  She was asked to testify as to what she may have been thinking on October 27 when viewing those records.  Because Dr. Beagle testified that she had no independent recollection of reviewing the ER records, the Court finds that Dr. Beagle's testimony as to what she was thinking on October 27 when reviewing the ER records is speculative and accordingly disregards it.

83.  At 12:15 p.m., shortly after seeing Ms. Basanti, Dr. Beagle, as is her habit and practice, recorded her initial impressions on an order sheet.  *See* Ex. 3, p. PVMC000074.  In the right column, Dr. Beagle recorded what she described as a problem list, or an initial working diagnosis.  Dr. Beagle listed four things: (1) generalized weakness, (2) hyponatremia, (3) diabetes, and (4) hypertension.  *Id.*

### i.  History and Physical Examination

84.  At 12:20 p.m., Dr. Beagle dictated a "HISTORY AND PHYSICAL EXAMINATION" note.  Ex. 3, p. PVMC000036.  Ms. Basanti's chief complaint is listed as "Generalized weakness."  With regard to patient history, the note stated:

> This is a 54 year-old lady with known history of diabetes with peripheral neuropathy[37] who presents with increasing weakness, nausea and vomiting over the past couple of days.  She also complains of pain in her right groin and her right neck.  Her sugars have been running high this morning, about 290 when she checked it.  She has a long standing history of weakness in her left leg.  However, she says, she initially felt like it was getting weaker on the right leg as well and causing some numbness and tingling.

---

[37]Peripheral neuropathy is the inflammation of the peripheral nerves.

*Id.* The note listed diabetes, hypertension, and left leg weakness secondary to neuropathy as relevant past medical history. *Id.* The note also mentioned Ms. Basanti's current medication and social and family history.

a. When questioned by plaintiff's counsel, Dr. Deutchman testified that Dr. Beagle's history, as charted, did not meet the standard of care. When evaluating a patient with potential neurologic deficits, he stated that it is important to know whether the deficit had a rapid or gradual onset. Dr. Deutchman testified that, based upon Dr. Beagle's note, it appeared that Dr. Beagle did not determine when Ms. Basanti first began having weakness issues related to her right leg and a sensory deficit in her left leg, as a reasonable physician would have done. Dr. Deutchman testified that, if Dr. Beagle failed to obtain a proper history, her chances of having a good differential diagnosis would be greatly diminished and that an inaccurate or incomplete differential diagnosis increases the likelihood of a misdiagnosis or delay in diagnosis. Because Dr. Deutchman's opinions on this point were elicited by plaintiff's counsel and because such opinions are, with the exception of certain opinions of Dr. Beagle, undisputed by any other family medicine physician, the Court finds Dr. Deutchman's opinions on this point credible and assigns them significant weight.

### ii.  Physical Examination

85.  With respect to Dr. Beagle's physical examination, her note states, as relevant here:

GENERAL

Thin female, well developed, otherwise lying in bed. She is of East Indian decent [sic]. She complains of pain and nausea in her stomach. She is very sleepy as she has received narcotics.

*     *     *

NECK

Neck is supple on palpation. There is no mass.

CHEST

Lungs are clear bilaterally with good expansion, no wheezes.

HEART

Regular rate and rhythm with no murmur.

ABDOMEN

Abdomen is nondistended. Bowel sounds are noted. They are slightly hyper-pitched. . . . There is no mass, rebound and no guarding. There is no pain in the suprapubic area.

EXTREMITIES

On legs she has no swelling or deformities noted. There are intact pulses bilaterally. On my examination there are still deep tendon reflexes although they are 1+bilaterally. There is no clonus and pulses are again intact in the feet.

There is a report in the ER that when family members touched her legs she claims that she could not feel it but when the doctor in the ER touched her legs she could feel his touch.

LABS AND STUDIES

The patient underwent a CT of her arms and head which was negative. She also had an MRI of her lower spine which showed no bulging discs. This is by report from the ER.

Please note that the neurologic examination in the ER showed that she is oriented times 3. She had good reaction to sensation on both legs with pin-prick sensation cold and normal Babinski. There is a +/- objective tingling reported without a significant pattern.

*Id.* at p. PVMC000036-37.  Dr. Beagle testified that she does not necessarily document every normal finding when examining a patient for motor function, testimony which the Court credits to some extent.

86.  Dr. Beagle's habit and practice of conducting a physical examination of a patient's extremities was as follows: ask the patient to move her toes or push against Dr. Beagle's hands.  Take the patient's pulse and ask if the patient felt her touch.  Lift the patient's leg up and tell the patient to completely relax the leg; usually the patient will try to assist and it is abnormal for the patient not to do so.  Move the patient's feet in a circle to check for clonus.

a.  Dr. Huffman criticized Dr. Beagle's neurological exam for failure to get Ms. Basanti out of bed or otherwise test her leg for weakness.  Although Dr. Huffman did not explain how such a test would be done and what a reasonable physician would have found had a proper neurological exam been performed, the Court assigns Dr. Huffman's opinion significant weight.

b.  Dr. Deutchman testified that Dr. Beagle's note does not document that Dr. Beagle asked Ms. Basanti to try to lift her legs off the bed.  Dr. Beagle admitted that, based solely upon her note, it is impossible to draw any conclusion about whether Ms. Basanti was able to move her legs at the time of examination.  Dr. Deutchman testified that the only charted evidence that Dr. Beagle performed her own physical examination of Ms. Basanti's motor function in her lower extremities was the examination of deep tendon reflexes.  Dr. Beagle testified that she checks deep tendon reflexes by lifting the patient's leg and tapping the patellar tendon.  To the extent Dr. Beagle's testimony of habit and

43

practice is offered to show that Dr. Beagle actually performed her entire standard physical examination on Ms. Basanti, the Court declines to credit such testimony. However, the Court finds it more likely than not that Dr. Beagle examined Ms. Basanti's legs to the extent necessary to determine deep tendon reflexes, including lifting Ms. Basanti's legs off the bed.

87.   Dr. Beagle reviewed the results of Ms. Basanti's CT scan and lumbar and brain MRIs.  Dr. Beagle interpreted the CT scan as showing arthritic changes, but nothing else abnormal, the brain MRI results as containing nothing abnormal, and the lumbar MRI results as showing signs of degenerative disc disease, but nothing else abnormal.

### iii.  Plan and Impression

88.   Dr. Beagle dictated her impression and plan as follows:

1.   Generalized weakness.  This could be secondary to the hyponatremia which is also causing her to feel sick to her stomach and throw up.  At this time we will gently replace her fluids and follow her electrolytes carefully. Differential of her generalized neuropathy could be from the hyponatremia. She also could be feeling weak and tired from possible infectious etiology such as a viral syndrome which is causing the nausea and vomiting as well. It is unlikely that she is having a stroke at this time.  She could also have a flair of her peripheral neuropathy which is causing her the subjective pain and tingling in her legs but does look like her neurologic examination is relatively intact.  Also we will follow and make sure that she is able to maintain urine output and bowel movements[.  I]f she has true incontinence of urine that would be a concern that there is something else going on.
2.   Diabetes type 2.  Had been relatively poor control [sic] until recently but she has also been feeling ill . . . .
3.   Hypertension.  Initially high but she was in distress when she came in. She currently is in good control . . . .
4.   This is a patient of Dr. Robinson's.  She is aware that the patient has been admitted.  She feels that the patient has been dealing with a subjective complaint of neuropathy in the out-patient setting for a while and so there may be a bit of a psychosomatic component to the condition.  We will follow

her closely with observation and see how she does with the above mentioned treatment.  The patient is a full COR status.

*Id.* at p. PVMC000037-38.

a.  Dr. Beagle testified that a Foley catheter can be used if the patient is a fall risk or taking narcotics that would increase the fall risk.  However, she admitted that a Foley catheter must be removed in order to fully evaluate a patient's ability to void.  There is no indication that Ms. Basanti's Foley catheter was ever removed in an effort to determine whether she retained the ability to void without assistance, yet Dr. Beagle testified that her note indicates that she had no concern about Ms. Basanti's ability to void.  Dr. Beagle did not explain this inconsistency.  The Court finds it more likely than not that Dr. Beagle was unable to tell whether Ms. Basanti was urinating properly on her own.  Dr. Deutchman testified that, under the circumstances, an inability to void would be very worrisome.

b.  Dr. Deutchman admitted that, on a worst first basis, spinal cord compression would be above hyponatremia and that Dr. Beagle did no further workup on spinal cord compression.  He further admitted that, in retrospect, Dr. Beagle should have been thinking of spinal cord compression, but consistently testified that, given her generalized weakness, hyponatremia, and diabetes, the CT and MRIs performed on Ms. Basanti to this point were a reasonable attempt at looking for a neurologic origin of her symptoms.

45

c. Dr. Beagle admitted that spinal cord compression should be considered when a patient is unable to void, suffers from new right leg weakness, prior left leg weakness, and sensory changes.

89.  Dr. Beagle testified that it was her standard practice when seeing a Salud patient at PVMC to contact the patient's PCP and, as a result, she contacted Dr. Robinson to discuss Ms. Basanti.  Neither Dr. Beagle nor Dr. Robinson recall the substance of their October 27 conversation regarding Ms. Basanti.

a. Dr. Beagle testified that, if a physician informed her that a patient had a history of progressive neurologic deficits, it would have been her habit and practice to record such information

b. Dr. Huffman testified that Dr. Beagle had a responsibility to review the Salud records herself, rather than relying on information Dr. Robinson provided during the phone call.  The Court credits this opinion to some extent, although Dr. Huffman did not explain how Dr. Beagle would go about requesting the Salud records, how long such a request might take, and the effect that seeing the Salud records would have had on Dr. Beagle's diagnosis and plan of care.[38]

### iv.  Conversation with Dr. Robinson

90.  In regard to Dr. Beagle's note concerning her conversation with Dr. Robinson, Dr. Robinson testified that, if she used the term "psychosomatic" during the conversation, she would have been expressing that life experiences can have an effect

---

[38]As noted above, there is no indication that the Salud records were available electronically at PVMC.

on pain.  Dr. Robinson indicated that she did not believe that Ms. Basanti was imagining her pain.[39]

      a.  Dr. Huffman testified that, rather than simply telling Dr. Beagle that Ms. Basanti's symptoms were psychosomatic, Dr. Robinson was required to review her notes and Ms. Basanti's chart and communicate with Dr. Beagle based upon the information contained within.  The Court credits this opinion.

      b.  Dr. Deutchman testified that, if the information contained in Dr. Beagle's note was the only information that Dr. Robinson transmitted to Dr. Beagle, Dr. Robinson failed to provide a complete picture of Ms. Basanti's care and breached the standard of care.  The Court credits this opinion.

      c.  The Court finds that Dr. Robinson expressed to Dr. Beagle that Ms. Basanti's complaints may have a psychosomatic component, but does not find sufficient evidence upon which to conclude, by a preponderance of the evidence, that this was the only information Dr. Robinson relayed to Dr. Beagle.[40]

---

[39]Dr. Robinson testified that Ms. Basanti's perception of pain may have been the result of sadness, due to her inability to speak English and the lack of a strong social network in the United States.  However, at her deposition, Dr. Robinson testified that she mostly remembered Ms. Basanti's family, rather than Ms. Basanti herself, and was not aware of her ethnicity.  Ms. Basanti testified that, during the relevant time period, she was not sad.  The Court declines to credit Dr. Robinson's trial testimony on factors affecting Ms. Basanti's perception of pain.

[40]At trial, plaintiff's counsel attempted to refresh Dr. Beagle's memory concerning her impressions following this conversation.  Dr. Beagle then testified that, after speaking with Dr. Robinson, Dr. Beagle was not of the impression that Ms. Basanti had been seen recently at the Salud Clinic for neurologic deficits.  The Court finds this testimony speculative and imprecise on the question of exactly what information Dr. Robinson shared during the conversation.  As a result, the Court assigns this testimony no weight.

### c.  Additional Standard of Care Opinions

91.  Dr. Deutchman offered the following additional opinions concerning the Salud physicians' care of Ms. Basanti up to this point:

a.  If Ms. Basanti's function deteriorated or did not improve, then guidelines for imaging practices, as discussed further below, recommended advanced imaging and specialist referral.

b.  Since the Salud physicians had available to them the information contained in the Salud records, Dr. Robinson was charged with knowledge of Ms. Basanti's care between September 9 and October 22 whether Dr. Robinson saw Ms. Basanti personally or not.  Dr. Robinson had an obligation to look at notes made by other physicians.

c.  If a Salud provider looked at the totality of Ms. Basanti's medical records, a provider would have noticed a progression of symptoms.  If, between September 9 and October 22, the Salud physicians had information that Ms. Basanti's neurological status was deteriorating and that she was having progressive deficits or leg pain, then specialist referral and advanced imaging should have been considered.  If a provider noticed the progression of symptoms and if Ms. Basanti's shoulder pain was viewed as thoracic pain, rather than shoulder pain, the one unifying diagnosis was a problem in the thoracic spine.  Because these opinions were elicited by plaintiff's counsel, the Court affords the opinions considerable weight.

### d. Subsequent Events

92.  Dr. Beagle testified that, based upon her note, no additional radiological imaging was necessary and that there was no indication of neurological deficits.

a.  Dr. Deutchman admitted that, had Dr. Beagle thought it appropriate, there was time to get an MRI of the thoracic spine before Ms. Basanti became paralyzed, but did not indicate that Dr. Beagle was required to order a thoracic MRI.

93.  Dr. Beagle's practice after leaving a patient's room is to discuss her orders with the nurse assigned to the patient and to tell the nurse to call with any questions. Dr. Beagle testified that she had an expectation that Ms. Basanti would be seen by nurses periodically.  Dr. Beagle's shift ended at 7:00 p.m.  Dr. Beagle testified that the incoming Salud physician during the night is usually not at the hospital unless he or she is called for admission.  Dr. Beagle testified that it was her habit and practice to brief the incoming Salud physician.

94.  After Dr. Beagle left her shift, it appears that Ms. Basanti's care was transferred to another Salud physician.  There was no evidence at trial concerning that physician's identity or role in Ms. Basanti's care.  Similarly, there was no criticism of the care provided to Ms. Basanti once Dr. Beagle went off shift.

95.  At 7:50 p.m., a PVMC nurse noted that Ms. Basanti was experiencing weakness in her left and right legs, but was able to move all extremities.  Ex. 3, p. PVMC000092.  At 8:05 p.m. and 11:45 p.m., a nurse recorded in the "Interventions" section of the nurses' notes that Ms. Basanti could ambulate with standby assistance. Ex. 3, p. PVMC000090.

### 4. October 28, 2009

#### a. PVMC

96.   On October 28, at 1:45 a.m., 3:45 a.m., and 6:54 a.m., nurses recorded in the "Interventions" section of the nurses' notes that Ms. Basanti could ambulate with standby assistance.  Ex. 3, p. PVMC000089.  At 8:10 a.m., a nurse made a similar indication in the "Interventions" section.  *Id.*  However, an 8:10 a.m. entry in the "Med Surg Basic Assessment" section of the nurses' notes by the same nurse indicates that Ms. Basanti was, at that time, unable to wiggle her toes or lift her legs.  *Id.* at p. PVMC000091.  The Court concludes that Ms. Basanti lost the use of her legs by 8:10 a.m. on October 28, 2009, but further finds that the inconsistency between the Med Surg Basic Assessment and Interventions sections on Ms. Basanti's ability to ambulate calls into question accuracy of the entries in the Interventions section, especially those made during the early morning hours of October 28.

a.   The 8:10 a.m. Med Surg Basic Assessment note also stated "pt states this is unchanged from admit."  *Id.*  There is no evidence that Ms. Basanti was unable to wiggle her toes or lift her legs at the time of admit.  Thus, the Court does not credit that particular statement as true.

97.  Dr. Beagle testified that, unlike the day before, she has an independent memory of seeing Ms. Basanti on October 28, 2009.  No expert witness was critical of Dr. Beagle's care on October 28, 2009.  The evidence at trial did not establish the precise time that Dr. Beagle saw Ms. Basanti that day.  Dr. Beagle dictated her note at 2:16 p.m., which indicates that Dr. Beagle saw Ms. Basanti before that time.  When Dr. Beagle examined Ms. Basanti, Ms. Basanti was unable to move her feet or legs.  Dr.

Beagle firmly pinched Ms. Basanti's legs.  Ms. Basanti was unable to feel anything.  Dr. Beagle testified that she remembers thinking that, at that point, Ms. Basanti's condition was becoming so serious that it might require transfer.  Dr. Beagle consulted with Dr. Honaganahalli, an internal medicine physician, who was concerned that Ms. Basanti may have been suffering from transverse myelitis[41] or Guillain-Barre syndrome.[42]  If Ms. Basanti had those conditions, she required specific care, including plasma electrophoresis, that PVMC could not provide.  Dr. Honaganahalli also suggested that Dr. Beagle consult with a neurologist.

98.  Dr. Beagle began arrangements to transfer Ms. Basanti to a different hospital.  Dr. Beagle spoke by phone with Dr. Celina Tolge, a neurologist consulting through the Medical Center of Aurora - South ("MCA"), who indicated that she would accept Ms. Basanti as a consult.  Dr. Beagle also spoke with Dr. John Barrett at MCA, an internal medicine physician, who agreed to act as the accepting physician for Ms. Basanti.[43]  At 2:30 p.m., Dr. Beagle signed Ms. Basanti's transfer paperwork.  Later that afternoon Ms. Basanti was transferred to Aurora South.

---

[41]Transverse myelitis is an inflammatory process that can affect the spine and cause paralysis.

[42]Guillain-Barre syndrome is a viral illness that attacks the peripheral nerves, which can cause rapid ascending paralysis.

[43]Neurology consults do not have the ability to admit patients to MCA.  In order to transfer a patient with neurological problems, a family medicine or internal medicine physician at the hospital must accept the patient for admission and routine care.

### b.  Medical Center of Aurora

99.  At some time before 5:16 p.m. on October 28, 2009, Dr. Tolge saw Ms.

Basanti.[44]  Dr. Tolge has no independent memory of her examination of Ms. Basanti.

According to the history documented in Dr. Tolge's note, Ms. Basanti reported that left

leg numbness and tingling began one month prior, with the onset of right leg numbness

approximately three days prior.  Ms. Basanti reported unawareness of sensation of

bladder fullness and urinary incontinence.  Dr. Tolge's physical examination confirmed

that Ms. Basanti was paraplegic in the lower extremities.  Dr. Tolge noted that a cranial

and lumbar MRI had been done at PVMC, that the cranial MRI was normal, and the

lumbar MRI demonstrated degenerative changes.  Ex. 5, p. MCA000027-29.  Dr.

Tolge's note contained the following assessment: "Rapidly progressive ascending lower

extremity sensory motor impairment with sphincteric disturbances, very concerning for

Guillain-Barre with autonomic dysfunction.  Consider compressive myelopathy[45] or

transverse myelitis in differential but consider these less likely."  *Id.* at p. MCA000029.

a.  At trial, Dr. Tolge interpreted her note to indicate that Guillain-Barre

was, although not the only consideration, the most likely explanation for Ms.

Basanti's condition at that time.  Guillain-Barre is considered a neurologic

urgency given the potential for complications in the respiratory system, but is a

treatable condition.  Dr. Tolge testified that she would generally expect a slower

---

[44]Dr. Tolge's note from the visit was dictated at 5:16 p.m., which indicates that the visit with Ms. Basanti took place before that time.

[45]Compressive myelopathy, as the term was used by Dr. Tolge, refers to anything that may be pushing on the spinal cord.

progression of neurologic symptoms with a compressive lesion and that three-

day rapidly progressing weakness and numbness is not a typical presentation for

a compressive lesion.  The Court finds Dr. Tolge to be credible; her testimony on

this point is essentially undisputed.  The Court assigns Dr. Tolge's opinion great

weight.

100.  Dr. Tolge's plan of treatment was as follows:

1.  Cervical and thoracic spine MRI without and with contrast to screen for
compressive myelopathy as well as transverse myelitis.
2.  CSF analysis to screen for albumino-cytologic dissociation characteristic
of Guillain-Barre, we will also ask for screening for CSF inflammatory
markers including oligoclonal band, IgG index, and synthesis rate.
3.  Prompt initiation of plasmapheresis.
4.  Monitor in ICU.

*Id.*  As a result, Dr. Tolge ordered an MRI of Ms. Basanti's thoracic spine.

a.  Dr. Tolge testified that an MRI is generally not done to confirm a

diagnosis of Guillain-Barre.  Rather, when considering a Guillain-Barre diagnosis,

Dr. Tolge's habit and practice is to image the spine to screen for alternative

diagnoses such as conditions affecting the spinal cord.  Dr. Tolge testified that

four hours and 45 minutes is not an unreasonable amount of time for MRI results

to be obtained.  The Court finds Dr. Tolge's testimony credible and assigns it

great weight.

101.  At some point before 5:19 p.m., Dr. Barrett also examined Ms. Basanti.

The history contained in his note is consistent with the history contained in Dr. Tolge's

note.  Ex. A-21, p. MCA00019.  Dr. Barrett's impression was, as relevant here:

This is a lady with a sort of questionable prodrome lasting for several weeks,
that I do not know what it means, but she has a rapid onset over several
days of ascending motor and sensory loss compatible with Guillain-Barre or

alternatively with a transverse myelitis.  I am doubtful that this would represent an epidural abscess or diskitis or mass lesion.

*Id.* at p. MCA 00021.

102.  It is unclear precisely when the results of Ms. Basanti's MRI became available. *See* Ex. A-21 at p. MCA 00346.[46]

103.  At approximately 8:00 p.m., Dr. Rauzzino received a call at home from Dr. Joseph Forrester.  Dr. Forrester told Dr. Rauzzino that Ms. Basanti's legs had likely been paralyzed for 12 to 24 hours and had no motor or sensory function.  Dr. Rauzzino viewed Ms. Basanti's thoracic MRI from home, which clearly showed a mass compressing the spinal cord.

a.  Dr. Rauzzino explained that, if a patient retains some function, then there is likely some continuity to the signals passing through the spinal cord and a chance for improvement.  If no motor or sensory function remains, even immediate surgery is unlikely to change the outcome.  Surgery to remove the cyst is a complicated operation and is not without risk, even for a patient who is already paralyzed.  Surgery during the night carries an additional risk that the surgical staff on duty may not be experienced in brain or spine operations.  Dr. Rauzzino testified that, nonetheless, he will operate at night if there is a chance to improve a patient's outcome.  Rather than perform surgery at night, Dr. Rauzzino elected to remove the cyst the next morning.  Dr. Rauzzino testified that, even if he had began operating at that very moment, Ms. Basanti's outcome

---

[46]The top of the document reads "MRI THORACIC SPINE WITHOUT AND WITH CONTRAST, 10/28/09, 1916 HOURS" and the document was electronically signed by F. Gaynor Laurence M.D. at 9:46 p.m.  *Id.*

would not have been altered in any way.  At trial, no expert witnesses was critical of Dr. Rauzzino's decision to delay Ms. Basanti's surgery.

### 5.  October 29, 2009

104.  Dr. Rauzzino began operating on Ms. Basanti at 9:00 a.m.  He began by making an incision in Ms. Basanti's back and drilling through bone to reach the dura. He made a small incision in the dura, and, within an hour or two, reached the cyst. Because the cyst had compressed and rotated the spinal cord slightly, Dr. Rauzzino was able to access the cyst without going through the spinal cord.  Dr. Rauzzino punctured the cyst, removed the fluid, and, once decompressed, was able to remove a majority of the cyst wall.

105.  Ms. Basanti did not regain any function following surgery.

### H.  Ms. Basanti's Testimony

106.  Ms. Basanti's testimony concerning the events of September and October 2009 was extremely limited.  Ms. Basanti testified that she visited Salud in September 2009 because of pain between her shoulder blades, but did not testify about specific visits.  Ms. Basanti estimated that she went to Salud five or six times for such pain and recalled that the Salud physicians prescribed medication and told her that her pain was diabetes-related.  She recalls that the prescribed medications temporarily reduced her pain.

107.  Ms. Basanti testified that her leg numbness began two to three months prior to her paralysis.

108.  Ms. Basanti appeared to have an independent recollection of going to PVMC on October 27, 2009.  Ms. Basanti testified that she was in a lot of shoulder

pain, and because of increasing numbness in one of her legs, did not feel comfortable driving herself. She phoned a friend to drive her to the hospital. Ms. Basanti testified that she was able to walk down the stairs at her home by herself and made her way to the car with the help of her husband and friend. When she arrived at PVMC, she was taken into the hospital in a wheelchair.

109. Ms. Basanti does not recall when she lost the use of her legs.[47] Ms. Basanti testified that she was concentrating on her pain and, as a result, does not recall when she lost movement and feeling in her legs.

### I.  Guidelines that Dr. Deutchman Discussed

110. Dr. Deutchman relied upon guidelines created by the National Guideline Clearinghouse entitled "Diagnostic imaging practice guidelines for musculoskeletal complaints in adults – an evidence-based approach" (the "guidelines"), the purpose of which is to develop imaging practice guidelines to assist chiropractors and other primary care providers in decision making for the appropriate use of diagnostic imaging for spinal disorders.[48] Dr. Deutchman considered the guidelines authoritative, but no other evidence was presented concerning the nature of the National Guideline Clearinghouse organization, its reputation in the medical community, or how the guidelines were prepared. The Court therefore gives the guidelines lesser weight.

---

[47]Ms. Basanti testified that, on the morning of October 28, her left leg was moving completely but her right leg was not. However, it appeared at trial as though Ms. Basanti was confused as to the time frame contemplated by her attorney's question. Thus, the Court gives Ms. Basanti's testimony on this point little weight.

[48]Statements from the guidelines were received into evidence. However, pursuant to Fed. R. Evid. 803(18), the document was not admitted as an exhibit.

111.  The guidelines set forth red flags for patients with thoracic pain, which, when present, increase the likelihood of a more serious underlying disorder.  However, the presence of a red flag alone may not necessarily indicate the need for radiography. The Court finds that the guidelines illustrate relevant considerations for reasonable family physicians to consider when evaluating a patient, but do not prescribe a course of action in every circumstance and are not a substitute for the standard of care.[49]

 a.  Red flags from the guidelines mentioned at trial include:

  - No response to care after four weeks.

  - Significant activity restriction of greater than four weeks.

  - Nonmechanical pain, such as unrelenting pain at rest or constant or progressive signs and symptoms.

  - Persistent localized pain for greater than four weeks.

  - Symptoms associated with neurologic signs in the lower extremities.

112.  When questioned by plaintiff's counsel at trial, Dr. Deutchman testified that Ms. Basanti's age (over 50) and leg symptoms constituted red flags.  Hypothetically, if Ms. Basanti's pain were localized between the shoulder blades, over the spine, Dr. Deutchman agreed that such pain would be a red flag.  The Court generally credits these opinions.  However, Dr. Deutchman also testified that, based upon his review of the medical records, Ms. Basanti's pain presented mostly in the shoulders, an opinion to which the Court gives less weight.

---

[49]There is no evidence that the Salud physicians were aware of these guidelines.

113.   When questioned about the guidelines by the government's counsel, Dr. Deutchman testified as follows: in the absence of what would be considered thoracic spine pain, the guidelines may not apply to Ms. Basanti.  Even if Ms. Basanti's pain was characterized as thoracic pain, the guidelines do not necessarily indicate that an MRI was required.  Back pain generally resolves itself in four to twelve weeks; thus, x-rays or other spinal imaging are generally not indicated until the patient's pain has been present for more than four weeks.  The Court assigns these opinions lesser weight to the extent they are inconsistent with testimony elicited from Dr. Deutchman by plaintiff's counsel.

## II.  CONCLUSIONS OF LAW

### A.  Federal Tort Claims Act

The FTCA provides that the United States may be held liable for "the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).  The Salud physicians are employed by a federally-funded clinic and, pursuant to the FSHCAA, are therefore deemed to be employees of the Public Health Service.  *See* 42 U.S.C. § 233(g).   The FTCA provides the exclusive remedy for actions against employees of the Public Health Service.  § 233(a).  There is no dispute that the Salud physicians were, at all times relevant, acting within the scope of their employment when caring for Ms. Basanti.  As such, the Salud physicians are covered under the FTCA, 28 U.S.C. § 1346(b) and §§ 2671-80, pursuant to which the Court exercises jurisdiction over this case.

58

Questions of liability under the FTCA are resolved "in accordance with the law of the state where the alleged tortious activity took place." *Franklin v. United States*, 992 F.2d 1492, 1495 (10th Cir. 1993). Because all relevant events in this case occurred in Colorado, the Court applies Colorado substantive law to plaintiff's claim.

## B.  Applicable Law

In Colorado, "[a] medical malpractice action is a particular type of negligence action." *Day v. Johnson*, 255 P.3d 1064, 1068 (Colo. 2011) (citing *Greenberg v. Perkins*, 845 P.2d 530, 534 (Colo. 1993)). "Like other negligence actions, the plaintiff must show a legal duty of care on the defendant's part, breach of that duty, injury to the plaintiff, and that the defendant's breach caused the plaintiff's injury." *Id.* at 1068-69 (citing *Greenberg*, 845 P.2d at 533).

### 1.  Duty of Care

In Colorado, "the law implies that a physician employed to treat a patient contracts with his patient that: (1) he possesses that reasonable degree of learning and skill which is ordinarily possessed by others of the profession; (2) he will use reasonable and ordinary care and diligence in the exercise of his skill and the application of his knowledge to accomplish the purpose for which he is employed; and (3) he will use his best judgment in the application of his skill in deciding upon the nature of the injury and the best mode of treatment." *Id.* at 1069 (citation omitted). "A physician who holds himself or herself out as a specialist in a particular field of medicine is measured against a standard commensurate with that of a reasonable physician practicing in that specialty," without regard for geographic locality. *Jordan v. Bogner*, 844 P.2d 664, 666-67 (Colo. 1993); *see also Hall v. Frankel*, 190 P.3d 852,

858 (Colo. App. 2008).   The Salud physicians undertook Ms. Basanti's medical care and treatment, which created a physician-patient relationship and corresponding duty of care.  *See Greenberg*, 845 P.2d at 534 (holding that physician undertaking medical care of another "expressly or impliedly contract[] to exercise reasonable and ordinary care").  Dr. Robinson and Dr. Beagle are both board certified "in the nationally recognized speciality of family practice" and held themselves out as qualified to practice in that specialty.  *See Jordan*, 844 P.2d at 667.  Although Dr. Rufner's background was not discussed at trial, both sides presented expert testimony from specialists in family practice who testified as to the standard of care applicable to a family practice physician.  The Court finds no reason to apply a lesser standard of care to Dr. Rufner.  The Court concludes that the Salud physicians should be judged against a standard commensurate with that of reasonable family medicine physicians.  *Id.* at 666-67 (holding that physician board certified in family medicine subject to standard of care for specialist practicing family medicine).

## 2. *Breach of the Duty of Care*

A physician possessing ordinary skill and exercising ordinary care in applying it is not responsible for a mistake of judgment.  *Bonnet v. Foote*, 107 P. 252, 254 (Colo. 1910) (citations omitted); *see Day*, 255 P.3d at 1069 (citing, *inter alia*, *Bonnet* and *Foose v. Haymond*, 310 P.2d 722, 727 (Colo. 1957) ("To avail himself of the defense of a mistake of judgment, it must appear that the physician used reasonable care in exercising that judgment.")).  Moreover, "a poor outcome does not, standing alone, constitute negligence." *Day*, 255 P.3d at 1069 (citing *Melville v. Southward*, 791 P.2d 383, 390 (Colo. 1990) ("The mere presence of an infection following surgery, however,

does not establish a *prima facie* case of negligence.")).  A plaintiff cannot therefore succeed by simply proving a bad outcome, but instead must show that the defendant physician failed to conform to the standard of care, measured here by whether a reasonably careful family medicine physician "would have acted in the same manner as did the defendant in treating and caring for the patient."  *Day*, 255 P.3d at 1069; *accord Greenberg*, 845 P.2d at 534; *Melville*, 791 P.2d at 389.

"[M]atters relating to medical diagnosis and treatment ordinarily involve a level of technical knowledge and skill beyond the realm of lay knowledge and experience." *Melville*, 791 P.2d at 387.  This case is no exception and, as such, "plaintiff must establish the controlling standard of care, as well as the defendant's failure to adhere to that standard, by expert opinion testimony."  *Id.*  An expert in one medical subspecialty is not generally permitted to testify against a physician in another medical subspecialty unless the expert demonstrates a "substantial familiarity" with the defendant's specialty or that "the standard of care for both specialties is substantially similar."  *Hall*, 190 P.3d at 858-59 (citing Colo. Rev. Stat. § 13-64-401).  The Court finds that no expert witness outside the specialty of family medicine satisfied either condition.  Thus, in evaluating the applicable standard of care, the Court relies on the opinions of the testifying family medicine physicians.  Nonetheless, where it is established that the standard of care for a particular issue is identical "regardless of specialty [and] common to all physicians and fourth-year medical students," physicians may, regardless of specialty, testify as to the general standard of care common to the medical profession.  *Id.* at 859.  Despite the fact that Dr. Rauzzino is not a family practice physician, the Court finds that the concept of red flags regarding back pain is common to all physicians regardless of

specialty and therefore will consider Dr. Rauzzino's testimony on the issue as relevant to the standard of care for family medicine physicians.

### 3. Causation

Where, as here, "an injury results from the combined negligence of the defendant and other factors, the injury is attributable to the defendant if the injury would not have occurred in the absence of the defendant's negligence." *Graven v. Vail Assoc., Inc.*, 909 P.2d 514, 520 (Colo. 1995); *see also June v. Union Carbide Corp.*, 577 F.3d 1234, 1254 (10th Cir. 2009); *Kaiser Found. Health Plan of Colo. v. Sharp*, 741 P. 2d 714, 719 (Colo. 1987) (holding that plaintiff must show that "that the injury would not have occurred but for the defendant's negligence conduct"); *Reigel v. SavaSeniorCare L.L.C.*, 292 P.3d 977, 987 (Colo. App. 2011) (collecting cases). Causation is therefore satisfied "'if the negligent conduct in a natural and continued sequence, unbroken by any efficient, intervening cause, produce[s] the result complained of, and without which the result would not have occurred." *N. Colo. Med. Ctr., Inc. v. Comm. on Anticompetitive Conduct*, 914 P.2d 902, 908 (Colo. 1996) (quoting *Smith v. State Compensation Ins. Fund.*, 749 P.2d 462, 464 (Colo. App. 1987)). However, "[i]n some cases the chain of causation is so attenuated" that no liability exists as a matter of law. *Rodriguez v. HealthONE*, 24 P.3d 9, 15 (Colo. App. 2000), *rev'd on other grounds* 50 P.3d 879 (Colo. 2002).[50]

---

[50]Plaintiff argues for the application of Restatement (Second) of Torts § 457, which states:

> If the negligent actor is liable for another's bodily injury, he is also subject to liability for any additional bodily harm resulting from normal efforts of third persons in rendering aid which the other's injury reasonably requires, irrespective of whether such acts are in a proper or negligent manner.

## C.  The Salud Physicians

This is a failure to diagnose case.  Ms. Basanti was paralyzed as a result of a cyst in the thoracic region of her spine, compressing her spinal cord.  There is no dispute that, if Ms. Basanti's cyst had been diagnosed and removed at any time before full paralysis, she would have been expected to retain some function in her legs. Similarly, it is undisputed that, between September 20 and October 28, the cyst would have been immediately visible on an MRI of Ms. Basanti's thoracic spine.  There was no indication that Ms. Basanti's cyst could have been definitively diagnosed by other means.  Thus, the causal analysis is considerably simplified.  The questions that remain are therefore two-fold: (1) did a particular Salud physician breach the standard of care

--------

Tortfeasors are not absolved of liability when a plaintiff's injuries "result from medical treatment reasonably sought and directly related to the actions of the original tortfeasor."  *Redden v. SCI Colo. Funeral Servs., Inc.*, 38 P.3d 75, 81 n.2 (Colo. 2001). Although § 457 has been applied in Colorado, it is typically cited where, unlike here, a plaintiff sought medical treatment for an injury not suffered as a result of medical malpractice.  *See, e.g.*, *Union Supply Co. v. Pust*, 583 P.2d 276, 285-86 (Colo. 1978) (holding that evidence of settlement with treating physicians not relevant to causation in case against conveyor belt manufacturer); *Madrid v. Safeway Stores, Inc.*, 709 P.2d 950, 951 (Colo. App. 1985) (discussing surgery necessary as a result of injury sustained during a fall); *Powell v. Brady*, 496 P.2d 328, 331 (Colo. App. 1972) (discussing medical treatment flowing from injury suffered in automobile-pedestrian collision), *superseded in part by statute*, Colo. Rev. Stat. § 13-21-111.6.  Plaintiff does not cite any authority, and the Court is aware of none, where § 457 has been applied in a case such as this.  Other courts have held that § 457 applies, in cases of successive malpractice, "only when the second physician's treatment is directed toward mitigating the harm inflicted by the first."  *Daly v. United States*, 946 F.2d 1467, 1472 (9th Cir. 1991).  Where, as here, a plaintiff seeks treatment from a "second physician for an underlying ailment rather than for any harm inflicted by earlier treatment," liability based upon § 457 does not arise.  *Id.*  Although not binding, the Court finds the reasoning in *Daly* persuasive and consistent with the text of § 457.  Moreover, plaintiff fails to reconcile § 457 liability with Colo. Rev. Stat. § 13-21-111.5, which requires that a fact finder apportion fault among negligent actors.  Thus, the Court finds that § 457 is not applicable.

and (2) if so, did such breach (or breaches) cause, in a natural and continued sequence, an MRI of Ms. Basanti's thoracic spine not to have been ordered or to be delayed past the point at which the cyst could have been diagnosed and removed before full paralysis.

### 1.  Dr. Robinson

With few exceptions, plaintiff did not identify the specific points at which Dr. Robinson's conduct allegedly breached the standard of care.  During closing argument, plaintiff argued that the signs and symptoms of spinal cord compression were present for Dr. Robinson to assemble, using a demonstrative exhibit to indicate that Dr. Robinson had access to all of the relevant medical records.  Plaintiff further argued that Ms. Basanti's treating physicians were improperly following up on her complaints. Plaintiff was critical of Dr. Robinson for failing to follow her own suggestion to order an MRI if Ms. Basanti's symptoms worsened and for telling Dr. Beagle that Ms. Basanti's symptoms may have been psychosomatic.  Dr. Huffman opined that Dr. Robinson failed to obtain PVMC ER records, failed to act upon her September 28 note concerning the possibility of ordering an MRI, and failed to communicate sufficient information to Dr. Beagle.  However, Dr. Huffman did not otherwise specify what signs and symptoms were present but went undiscovered by Dr. Robinson, what area of the body Dr. Robinson should have imaged, or what a reasonable family physician would have done differently than Dr. Robinson.  Although plaintiff attacked the credibility of Dr. Robinson and Dr. Deutchman during their testimony and, in the process, elicited multiple expert opinions relevant to the standard of care, plaintiff did not explain how such opinions advanced her theory of liability, nor was it always apparent.  Because plaintiff is

required to establish that Dr. Robinson breached the standard of care by expert testimony, the Court is not permitted to consider those breaches that plaintiff appeared to assert but failed to support with expert testimony.

The Court first turns to Ms. Basanti's September 9 visit with Dr. Robinson. Dr. Robinson indicated that, given Ms. Basanti's age and the duration and severity of her symptoms, Ms. Basanti's symptoms were not particular concerning. Notably, no other family medicine physician disagreed or was critical of Dr. Robinson's conduct during this visit.[51]

The Court next turns to Ms. Basanti's September 28 visit with Dr. Robinson. The Court finds that a reasonable family physician would have acquired the records from Ms. Basanti's September 20 PVMC ER visit or spoken to Dr. Metcalf regarding his care and treatment of Ms. Basanti. Dr. Huffman testified unequivocally that Dr. Robinson breached the standard of care by failing to do so. Dr. Deutchman's opinions to the contrary are not credible and contradicted by his own testimony. *See supra* Finding of Fact No. 52. Had Dr. Robinson acted in accordance with the standard of care, she would have learned that a central nervous system mass or tumor was listed on Dr. Metcalf's differential diagnosis and that Dr. Metcalf did not otherwise rule out that particular diagnosis. However, plaintiff fails to show that this particular breach led to a delay in the diagnosis of Ms. Basanti's thoracic cyst. Dr. Huffman opined that, had Dr. Robinson acquired the PVMC ER records, a more aggressive workup would, perhaps, have resulted. *Id.* Dr. Huffman failed to explain how Dr. Robinson or any reasonable

---

[51] Moreover, Ms. Basanti subsequently visited Dr. Walter on two separate occasions with similar complaints, yet plaintiff was not critical of Dr. Walter's care.

family physician would have acted differently if armed with the knowledge contained in Dr. Metcalf's note and plaintiff does not otherwise indicate how such knowledge would have altered the appropriate course of treatment.  Dr. Deutchman testified that, hypothetically, if Dr. Rufner had been aware of Dr. Metcalf's differential diagnosis, ordered a lumbar MRI which came back negative, and thought a lesion higher up was causing Ms. Basanti's symptoms, then ordering a thoracic MRI would have made sense.  *See supra* Finding of Fact No. 64.  Plaintiff did not ask Dr. Deutchman to elaborate or further explain his opinion and, as such, the Court has difficulty construing the hypothetical as an opinion that it violated the standard of care *not* to order a thoracic MRI.  Even assuming the hypothetical can be applied to Dr. Robinson, plaintiff presented no evidence that a reasonable family physician would have ordered a lumbar MRI at this point and, as such, the hypothetical lacks a sufficient factual connection to this case to have any weight.  The Court cannot therefore conclude that plaintiff has met her burden of showing that Dr. Robinson's failure to acquire the PVMC ER records delayed the ordering of a thoracic MRI or was otherwise a legally sufficient cause of Ms. Basanti's injuries.

For the above-stated reasons, the Court does not credit Dr. Huffman's opinion that Dr. Robinson breached the standard of care for failure to order an MRI of Ms. Basanti's back based upon a note from a May 18, 2006 physical therapy visit.  *See supra* Finding of Fact No. 52 n.19.  Even if Dr. Huffman's testimony were construed as an opinion that Dr. Robinson was obligated to look back at this particular note, the issues Ms. Basanti complained of in 2006 appeared to have resolved without further medical intervention.  Dr. Huffman does not otherwise sufficiently explain what

information in the 2006 physical therapy note should have been concerning to Dr. Robinson.  Moreover, there is no evidence that Ms. Basanti's symptoms in 2006 are attributable, or would have been attributed by a reasonable family physician, to the presence of a thoracic cyst.

Plaintiff also failed to show that Dr. Robinson was required on September 28 to initiate further workup of Ms. Basanti's symptoms.  There is no indication that Ms. Basanti had pain directly over the thoracic spine.  The shoulder pain complained of was associated with tightness of the subscapularis muscles and her shoulder joint had normal strength and movement.  Although the experts generally agreed that pain can be referred from one location to another, neither Dr. Huffman nor Dr. Deutchman testified that Dr. Robinson should have appreciated Ms. Basanti's shoulder pain as associated with a thoracic spinal cord issue.  There is no indication that Ms. Basanti complained of any leg weakness or that Dr. Robinson should have appreciated leg weakness.  Although Dr. Robinson's diagnosis of a lower back issue would not have conclusively explained all of Ms. Basanti's symptoms, pain in the lumbar spine can cause a sensation of numbness in the leg.  Neither Dr. Huffman nor Dr. Deutchman were critical of Dr. Robinson's decision to order x-rays of the shoulder and lumbar spine.  Dr. Deutchman testified that Dr. Robinson was not at this point required to order an MRI of the thoracic spine and no expert witness testified to the contrary.  *Supra* Finding of Fact No. 55.  Moreover, as evidenced by her note, Dr. Robinson was considering the possibility of an MRI if Ms. Basanti's condition worsened.  *See* Ex. 1, p. SF000101.  Based upon Ms. Basanti's presentation on September 28, the Court cannot

conclude that a reasonable family physician would have initiated further workup to rule out a thoracic spinal cord tumor, let alone ordered a thoracic MRI.

The October 5 visit with Dr. Robinson was initiated by the Salud Clinic and was for the stated purpose of reviewing lab results.  There is no indication Ms. Basanti made a specific complaint or otherwise indicated that her condition was worsening.  To the contrary, Ms. Basanti indicated that her pain had improved without the use of medications, a finding which, according to Dr. Deutchman's undisputed testimony, decreased the urgency of doing further evaluation.  *See supra* Finding of Fact No. 57. Although plaintiff was critical of Dr. Robinson's admitted failure to conduct a full neurological exam during this visit, neither Dr. Huffman's nor Dr. Deutchman's testimony supported such criticism.  Moreover, plaintiff failed to show what findings a full neurological exam would have uncovered.  Ms. Basanti did not testify that she was suffering from leg weakness or complete numbness in both legs consistent with spinal cord compression as of October 5.  Dr. Rauzzino testified that Ms. Basanti was likely suffering from neurological symptoms related to her cyst during this time period, but the Court finds that he was unable to determine, to a reasonable degree of medical certainty, precisely what symptoms would have been present.  *See supra* Finding of Fact No. 26.  For the reasons discussed above, the medical record is, by itself, insufficient to conclude that Ms. Basanti was experiencing numbness in both legs consistent with spinal cord compression.  *See supra* Finding of Fact No. 56.a.  At best, it is more likely than not that the numbness Ms. Basanti reported on September 28 was still present on October 5.  Even if Dr. Robinson had performed a full neurological exam, it is unclear what she would have found, and plaintiff fails to show whether such

68

findings would have prompted a reasonable family physician to take further action.[52]  As for the possibility of further imaging, Dr. Deutchman testified that Dr. Robinson was not, at this point, required to order a lumbar or thoracic MRI and no other family medicine physician offered a contrary opinion.  *See supra* Finding of Fact No. 59.  The Court cannot therefore conclude that Dr. Robinson breached the standard of care during Ms. Basanti's October 5 visit.

Dr. Robinson admitted that, on October 12, she documented only the location and severity of Ms. Basanti's symptoms.  Although there was no direct criticism of Dr. Robinson's patient history, it is possible to infer that, based upon the testimony of Dr. Deutchman, Dr. Robinson, and Dr. Beagle, a reasonable family physician would have inquired about Ms. Basanti's symptoms in more detail.  Dr. Robinson admitted that she did not perform a neurological examination for reasons that were not entirely credible.  *Supra* Finding of Fact No. 67.  However, no family medicine physician was directly critical of her decision not to perform such an examination, especially given the fact that Ms. Basanti reported that her back pain had improved.  The Court will not therefore infer that Dr. Robinson's patient history and failure to conduct a neurological examination breached the standard of care.  Even assuming that a breach did occur, as discussed above, the lack of evidence as to what symptoms Ms. Basanti was experiencing at this time provides no basis upon which to determine what a more thorough patient history or neurological exam would have revealed.

---

[52]Although plaintiff argued that Dr. Robinson's failure to keep adequate records caused this uncertainty, this does not discharge plaintiff's burden of showing what would have been revealed with better record keeping or a more thorough patient history and how such information would have led to an earlier diagnosis of Ms. Basanti's cyst.

October 12, 2013 was Dr. Robinson's last visit with Ms. Basanti.  There was no expert testimony suggesting that she breached the standard of care by failing to initiate contact with Ms. Basanti after that date.  The Court therefore turns to the question of whether Dr. Robinson was required on October 12 to order further imaging.  Dr. Huffman seemed to suggest that, based upon Dr. Robinson's September 28 note and Ms. Basanti's persistent symptoms, Dr. Robinson should have ordered an MRI.  *See supra* Finding of Fact No. 68.b.  Thus, Dr. Huffman appeared to be of the opinion that Dr. Robinson's note expressed the relevant standard of care, such that if Ms. Basanti's symptoms worsened or, if more objective findings of weakness manifested, Dr. Robinson was required to order an MRI.[53]  Dr. Huffman did not further explain his opinion, which suffers from two flaws.  First, implicit in Dr. Huffman's testimony is a belief that Ms. Basanti's symptoms did indeed worsen between September 28 and October 12.  The evidence does not support such a conclusion.  Plaintiff was critical of Dr. Robinson for failing to thoroughly examine Ms. Basanti to establish a baseline by which Ms. Basanti's symptoms could subsequently be judged.  However, as discussed above, plaintiff fails to show, by a preponderance of evidence, that, had such a baseline been established, a reasonable family physician would have determined that Ms. Basanti's symptoms had worsened.  Ms. Basanti did not offer any testimony concerning her symptoms during this period.

---

[53]Dr. Huffman's testimony on this point was not entirely clear and is subject to more than one interpretation.  The Court, however, interprets Dr. Huffman's testimony liberally.

Dr. Robinson was, as Dr. Deutchman testified, charged with knowledge of information contained in the Salud records during the relevant time period. *See supra* Finding of Fact No. 91.b. On September 28, Ms. Basanti was suffering from right shoulder pain, lower back pain, and left leg numbness. *See* Ex. 1, p. SF000101. As discussed above, as of October 5, Ms. Basanti's back pain improved and her leg numbness persisted. *See supra* Finding of Fact No. 56. As of October 9, Ms. Basanti's left leg numbness did not improve, but she had sensation in both her lower extremities. *See* Ex. 1, p. SF000110. On October 12, Ms. Basanti's back pain again improved, but there was little indication that her leg numbness or shoulder pain either improved or worsened. *See* Ex. 1, p. SF000112. The medical records are therefore inconclusive. The Court cannot conclude that a reasonable family physician, when viewing the medical records of Ms. Basanti's visits between September 28 and October 12, would have determined that Ms. Basanti's symptoms had worsened. The more reasonable conclusion is that Ms. Basanti's numbness and shoulder pain persisted without significant improvement. On that basis, Dr. Huffman's opinion that Dr. Robinson should have ordered an MRI if Ms. Basanti's symptoms worsened is factually unsupported.

Second, Dr. Huffman did not explain what area of the body the standard of care required Dr. Robinson to image. Dr. Robinson and Dr. Deutchman interpreted Dr. Robinson's September 28 note's reference to an MRI as referring to MRIs of the shoulder and/or lower back. *Supra* Finding of Fact No. 55. Their testimony is undisputed and there is no suggestion that an MRI of the thoracic spine was, or should have been, contemplated as of September 28. Even if an MRI of the shoulder and lower back were conducted and the results failed to explain Ms. Basanti's symptoms,

71

neither Dr. Huffman nor any other family medicine physician explained how the appropriate course of treatment would subsequently lead to the ordering of a thoracic MRI.  The Court therefore declines to adopt Dr. Huffman's opinion.

The testimony of Dr. Robinson and Dr. Deutchman does not lead the Court to a different conclusion.  Dr. Robinson's diagnosis of back and shoulder pain caused by osteoarthritis did not, according to the expert testimony in this case, entirely explain Ms. Basanti's shoulder pain.  Similarly, had plaintiff established that Ms. Basanti was indeed presenting with indications of complete leg numbness consistent with spinal cord compression, lumbar back pain would not have explained such numbness.  Just because Dr. Robinson's diagnosis was not entirely credible does not necessarily establish that she breached the standard of care in failing to order further imaging.  Dr. Robinson agreed that leg numbness and pain in the thoracic spine can be red flags indicating more serious underlying pathology, and that, if one or more red flags were present, a neurologic evaluation should generally be done.  *See supra* Finding of Fact No. 22 n.7.  The presence of red flags does not, however, in every instance dictate that the patient undergo an MRI.  Moreover, plaintiff fails to show that, had a more thorough neurological evaluation been done, complete numbness consistent with spinal cord compression would have been found and that a reasonable family physician should have perceived Ms. Basanti's shoulder pain as pain in the thoracic spine.

Dr. Deutchman's credibility was negatively affected where, when questioned by government counsel, his opinions were inconsistent with prior testimony elicited by plaintiff's counsel during his deposition and at trial.  He testified that Dr. Robinson was not required to order a lumbar or thoracic MRI on October 12 because Ms. Basanti's

symptoms were not referable to the thoracic area and appeared to be improving.  *Supra* Finding of Fact No. 68.c.  As discussed above, Dr. Deutchman's opinion fails to consider the undisputed testimony that pressure on the dura can cause pain that is referred to other locations.  To that extent, his opinion is not entirely credible.  However, with the exception of the above-discussed opinion of Dr. Huffman, no other family medicine physician testified that Dr. Robinson was required to conduct further imaging. The Court cannot therefore conclude that Dr. Robinson breached the standard of care by failing to order additional imaging on October 12.  Moreover, even if a lumbar and shoulder MRI had been ordered, as contemplated by Dr. Robinson's September 28 note, plaintiff fails to show or explain through expert testimony how ordering such imaging would lead a reasonable family physician in the appropriate course of treatment to subsequently order a thoracic MRI.  Plaintiff therefore fails to show that Dr. Robinson breached the standard of care on October 12 or that any such breach was a legally sufficient cause of Ms. Basanti's injuries.

The Court turns to the October 27, 2009 phone conversation between Dr. Robinson and Dr. Beagle, where Dr. Robinson expressed to Dr. Beagle that Ms. Basanti's pain had, to some extent, a psychosomatic component.  *See supra* Finding of Fact No. 90.  Dr. Robinson did not have a credible explanation for believing that Ms. Basanti's symptoms were in fact psychosomatic.  Dr. Huffman testified that, rather than generally stating that Ms. Basanti's pain may be psychosomatic, Dr. Robinson was required to review the Salud records herself to provide Dr. Beagle additional information.  *Id.*  Dr. Deutchman testified that, if the only thing Dr. Robinson told Dr. Beagle was that Ms. Basanti's pain was psychosomatic, Dr. Robinson breached the

73

standard of care.  *Id.*  However, both opinions lack factual support in the record.  First, the most reasonable interpretation of Dr. Beagle's note is that Dr. Robinson told Dr. Beagle that Ms. Basanti's pain had "a bit" of a psychosomatic component, Ex. 3, p. PVMC000037-38, which does not does not entirely support plaintiff's argument that Dr. Robinson told Dr. Beagle that Ms. Basanti was "making up" all symptoms.  Moreover, the fact that Dr. Robinson may have been incorrect in her belief that Ms. Basanti's pain had "a bit" of a psychosomatic component does not, by itself, appear to violate the standard of care.  Second, Dr. Robinson and Dr. Beagle do not have any specific memory of their conversation, which places plaintiff in the position of having to prove that Dr. Robinson did not review her notes and did not provide Dr. Beagle with any additional information.  There is some suggestion that, had Dr. Beagle been provided with information that Ms. Basanti had a history of neurological deficits, it was Dr. Beagle's habit and practice to record such information but that no such information was recorded.  *See supra* Finding of Fact No. 89.  Dr. Beagle's testimony regarding her habit and practice on this issue was not persuasive and, as a result, the Court will not make an inference based on the absence of certain information in Dr. Beagle's note.  Because there is no other evidence of what additional information, if any, was exchanged during the conversation, plaintiff fails to meet her burden of showing what additional information Dr. Robinson did or did not share, rendering the experts' criticisms without factual support.  Moreover, even if the Court assumed that Dr. Robinson breached the standard of care by failing to pass on information she should have been aware of, neither Dr. Huffman, Dr. Deutchman, nor Dr. Beagle explained how additional information from Dr. Robinson would have altered the appropriate

74

course of treatment and hastened the performance of a thoracic MRI.  It is possible to

infer that, had Dr. Robinson communicated the contents of the diabetic educator's

October 22 note indicating that Ms. Basanti was having difficulty walking, Dr. Beagle

may have had a clearer picture of Ms. Basanti's symptoms, but plaintiff provides no

expert testimony to explain whether this information would have led to a different result,

especially, as discussed below, given that Ms. Basanti was being treated for other

issues.  Thus, the Court finds that plaintiff has failed to show that Dr. Robinson

breached the standard of care during her October 27 conversation with Dr. Beagle and,

in the alternative, that the alleged breach was a legally sufficient cause of Ms. Basanti's

injuries.

Plaintiff suggested that Dr. Robinson's longitudinal care of Ms. Basanti did not

comport with the standard of care.  Plaintiff's counsel argued that the National

Guideline Clearinghouse guidelines required the Salud physicians to conduct further

imaging or specialist referral.  Dr. Deutchman admitted that Ms. Basanti's age and leg

symptoms constituted red flags and testified that, if Ms. Basanti's function did not

improve, the guidelines recommended imaging.  *See supra* Finding of Fact Nos. 91,

112.  He further testified that Dr. Robinson, as a Salud provider, was charged with

knowledge of Ms. Basanti's care during the relevant time and, when looking at the

totality of Ms. Basanti's medical records, would have noticed a progression of

symptoms.  Under the guidelines, advanced imaging and specialist referral should have

been considered.  *See id.*  Because this information was elicited by plaintiff's counsel,

the Court finds it credible.  Nevertheless, while credible, it is insufficient to meet

plaintiff's burden for multiple reasons.  First, Dr. Deutchman did not further explain his

75

opinion or point to specific records from which a reasonable family physician would have perceived progressive neurological deficits or disabling leg pain.  Although, in hindsight, Ms. Basanti was suffering from neurological deficits related to her cyst and there is no indication that her left leg numbness improved during the relevant time period, there is insufficient evidence upon which to conclude that a progression of neurological deficits was taking place between September 20 and October 12 that Dr. Robinson should have considered.  Second, as noted earlier, the guidelines are relevant considerations but do not substitute for the standard of care.  Dr. Deutchman did not provide a detailed explanation of why he believed the guidelines were authoritative and to what degree the guidelines were accepted in the medical community.  Third, the guidelines do not prescribe a course of action or indicate which area of the body should be imaged.  As noted above, there is no evidence that a reasonable family physician would have first ordered a thoracic MRI and no explanation of how an MRI of, for example, the lumbar spine would lead to the ordering of a thoracic MRI.  Similarly, plaintiff failed to show that specialist referral would have altered the outcome.  This omission is significant, especially given that Dr. Tolge examined Ms. Basanti when she had dramatically more severe symptoms, yet believed that Guillain-Barre was the primary diagnosis.  *See supra* Finding of Fact No. 99.a.  Thus, even if the guidelines suggested that Dr. Robinson should have conducted further imaging or specialist referral, plaintiff fails to show that such actions would have resulted in an earlier diagnosis.  The same holds true for the presence or absence of other back pain red flags.  As with the aforementioned alleged breaches of the standard of care, here

plaintiff failed to show what steps a reasonable family physician would have taken that would have led to the ordering of a thoracic MRI.

Dr. Huffman appeared to suggest that all of the breaches of the standard of care he identified during his testimony led to a delay in the correct diagnosis.  Even if the Court construes Dr. Huffman's testimony as an opinion that all of Dr. Robinson's breaches, taken together, caused a delay in diagnosis, Dr. Huffman's testimony is conclusory and without support.  Dr. Huffman did not explain how, had the claimed breaches not occurred, the appropriate course of treatment would have been altered so as to lead to a timely thoracic MRI.  *See Flores-Hernandez v. United States*, 910 F. Supp. 2d 64, 79 (D.D.C. 2012) ("Flores-Hernandez did not present any testimony, from Dr. Boothby or otherwise, establishing that a cone biopsy would have been the appropriate course of treatment upon a finding of CIN-1.").  Dr. Huffman's opinion is therefore insufficient to establish Dr. Robinson's liability.

Although Dr. Robinson did not, in all instances, act in accordance with the standard of care, plaintiff fails to meet her burden of showing that any such breaches would have led to a timely thoracic MRI.  The causal chain is therefore too attenuated to find Dr. Robinson liable for Ms. Basanti's injuries.

### 2. Dr. Rufner

Plaintiff's lone criticism of Dr. Rufner during closing arguments appeared to be that Dr. Rufner failed to adequately communicate with Ms. Basanti's other treating physicians.  Dr. Huffman did not offer an opinion on Dr. Rufner's care and neither side

called Dr. Rufner as a witness.  Thus, Dr. Deutchman was the only expert to offer an opinion concerning Dr. Rufner's care.[54]

Dr. Rufner saw Ms. Basanti on a single occasion.  Plaintiff presented no substantive evidence that Dr. Rufner was required to acquire the records from Ms. Basanti's September 20 PVMC ER visit.  *See Melville*, 791 P.2d at 387.  Although plaintiff appeared to argue that Dr. Rufner was required to do her own workup of Ms. Basanti's leg numbness, Dr. Deutchman testified that Ms. Basanti's visit was for the purpose of changing her diabetic medication such that Dr. Rufner was not required to address Ms. Basanti's complaint of leg numbness.  *Supra* Finding of Fact No. 64.  Dr. Deutchman's testimony was undisputed.  Although, in hindsight, Dr. Rufner's apparent belief that Ms. Basanti's leg numbness had been "worked up" at the hospital proved to be incorrect, the belief was based upon information provided by Ms. Basanti and no expert found Dr. Rufner's belief unreasonable or testified that Dr. Rufner was required to confirm information provided by her patient.  *See supra* Finding of Fact No. 62.b. Plaintiff presented insufficient substantive evidence that Dr. Rufner was required to order an MRI as contemplated by Dr. Robinson's September 28 note and Dr. Deutchman testified that Dr. Rufner was not required to order a thoracic MRI.[55]  *See*

---

[54]Although the Court could infer that Dr. Rufner breached the standard of care based upon the expert testimony offered against Dr. Beagle and Dr. Robinson, the Court declines to do so, finding that plaintiff failed to prove that such testimony was applicable to Dr. Rufner.

[55]Dr. Deutchman also testified to a hypothetical concerning Dr. Rufner's care. Plaintiff did not ask Dr. Deutchman to further explain the basis for his hypothetical and, as noted above, it lacks a sufficient factual connection to this case at several steps.  For example, there is insufficient expert testimony upon which to conclude that Dr. Rufner was required to order the PVMC ER records and that she was required to order a

*supra* Finding of Fact No. 64.a.  Plaintiff has failed to show that Dr. Rufner breached the standard of care.

### 3.  Dr. Beagle

Plaintiff criticized Dr. Beagle for performing a perfunctory assessment of Ms. Basanti on October 27.  The criticisms of Dr. Beagle leveled by the expert witnesses in this case consist of the following:  Dr. Deutchman criticized Dr. Beagle for failing to obtain a proper patient history.  He explained that, when evaluating a patient with neurological deficits, it is important to know when those deficits first occurred.  As such, a reasonable family physician would have determined when Ms. Basanti first started having weakness issues in her right leg and sensory deficits in her left leg.  *See supra* Finding of Fact No. 84.a.  The Court finds, by a preponderance of evidence, that Dr. Beagle failed to take a proper patient history, namely, that Dr. Beagle failed to determine when Ms. Basanti's neurological deficits first occurred.  Dr. Deutchman further testified that the failure to obtain a proper history diminishes the chances of an accurate differential diagnosis and increases the likelihood of a misdiagnosis or delay in diagnosis.  *Id.*  However, "the fact that a defendant's conduct increased the victim's risk of injury does not necessarily mean that the defendant's conduct was a but-for cause of the injury or a necessary component of a causal set of events that would have caused the injury."  *Reigel*, 292 P.3d at 987.  Dr. Deutchman was not asked to explain what a more thorough history would have unearthed and how it would have changed the

---

lumbar MRI.  Therefore, because the steps of the hypothetical are not factually supported, the Court cannot credit the conclusion, namely, that Dr. Rufner had a responsibility to look at the remainder of the spine and that it would have made sense to proceed with a thoracic MRI.

appropriate course of treatment. No other family medicine physicians offered an opinion on the issue. Thus, the Court finds that plaintiff has failed to show that Dr. Beagle's negligent patient history was a legally sufficient cause of Ms. Basanti's injuries.

Dr. Huffman testified that Dr. Beagle's neurological exam violated the standard of care for failure to thoroughly check for muscle weakness. *Supra* Finding of Fact No. 86. Dr. Deutchman admitted that the medical records did not document that Dr. Beagle asked Ms. Basanti to lift her leg off the bed. *Id.* Although Dr. Beagle lifted Ms. Basanti's legs off the bed to test for deep tendon reflexes, there is no indication that Ms. Basanti assisted Dr. Beagle in lifting her leg off the bed as Dr. Beagle indicated patients generally do. *Id.* As such, the Court cannot conclude that Dr. Beagle assessed Ms. Basanti's motor function. Moreover, rather than listing her own physical exam findings on leg sensation and strength, Dr. Beagle's note suggests that she relied on the neurologic examination conducted by Dr. Rozeski – further indication that Dr. Beagle did not conduct her own assessment of Ms. Basanti's legs to check for numbness. *See* Ex. 3, p. PVMC000037. The Court finds that Dr. Beagle breached the standard of care by failing to determine the degree of numbness and motor function in Ms. Basanti's legs. Nonetheless, it is not clear what a more thorough neurologic exam would have uncovered. At approximately 6:30 a.m., Dr. Bracy determined that Ms. Basanti was unable to move her right leg,[56] yet a nurse examining Ms. Basanti at 11:20 a.m., and later at 7:50 p.m., noted that Ms. Basanti was experiencing weakness in her

---

[56]As noted above, it is unlikely that Dr. Bracy communicated to Dr. Beagle the full extent of his neurologic findings.

legs, but was able to move all extremities.  Ex. 3, p. PVMC000093.  The nurses' notes during the evening of October 27 indicate that Ms. Basanti was able to ambulate with standby assistance.  *See supra* Finding of Fact No. 95.  The evidence, therefore, does not support an inference that a complete neurological examination at approximately 11:00 a.m. would have revealed that Ms. Basanti was unable to move her right or left leg.  Moreover, plaintiff again fails to explain how such a finding would have altered the appropriate course of treatment and led to a thoracic MRI.  By this time, a brain and lumbar MRI had already been performed, which, according to Dr. Beagle's note, did not appear to explain Ms. Basanti's condition.  *See* Ex. 3, p. PVMC000037-38.  Although spinal cord compression may have been a unifying diagnosis for Ms. Basanti's neurological symptoms, Ms. Basanti was also hyponatremic and had high glucose levels.  Hyponatremia and high glucose levels, in retrospect, may not have conclusively explained all of Ms. Basanti's symptoms, but nonetheless required treatment and fit the clinical picture of someone with generalized weakness and gastrointestinal issues.  *See supra* Finding of Fact No. 88.b.  No expert witness clearly expressed an opinion that, had a reasonably family physician found Ms. Basanti unable to move her right leg, the appropriate course of treatment at that point would have been to order a thoracic MRI.  *See Melville*, 791 P.2d at 387.  Thus, the Court cannot find, by a preponderance of evidence, that Dr. Beagle's failure to conduct a proper neurological exam was a legally sufficient cause of Ms. Basanti's injuries.

Dr. Huffman criticized Dr. Beagle for relying on Dr. Robinson's assessment of Ms. Basanti's symptoms and opined that Dr. Beagle should have conducted her own review of Ms. Basanti's Salud records.  *Supra* Finding of Fact No. 89.b.  It was possible

for Dr. Beagle to call and ask a Salud staff member to relay specific information from the Salud records.  However, there is no indication that the Salud records were available at PVMC electronically and it is unclear how long it would have taken for physical copies of the records to arrive at PVMC.  However, even if the Court accepts Dr. Huffman's opinion, Dr. Huffman does not explain what a reasonable family physician, standing in the shoes of Dr. Beagle on October 27, 2009, would have gleaned from the Salud records and how such information would have altered the appropriate course of treatment.  Dr. Beagle was already aware that Ms. Basanti had a "long standing history of weakness in her left leg" and was complaining of increasing weakness in her right leg.  Ex. 3, p. PVMC000036.  As discussed above, Dr. Deutchman was of the opinion that a Salud physician, looking at the totality of Ms. Basanti's medical records, would have noticed a progression of symptoms and, under the guidelines, advanced imaging and specialist referral should have been considered. *See supra* Finding of Fact No. 91.c.  However, advanced imaging of the lumbar spine and brain had already been conducted by this point and the guidelines do not prescribe a specific course of treatment or set forth next steps.  More critically, even assuming Dr. Beagle was able to acquire the records before going off shift and assuming such information would have led a reasonable family physician to order a thoracic MRI, plaintiff does not show that the standard of care required an MRI to be ordered immediately and, if so, whether time remained to conduct a thoracic MRI at PVMC and to remove the cyst prior to Ms. Basanti becoming paralyzed.  Thus, the Court cannot find that Dr. Beagle is liable for a failure to conduct her own review of the Salud records.

There are troubling aspects of Dr. Beagle's care.  For example, the experts generally agree that the inability to void can be consistent with a spinal cord injury.  There is no indication that Ms. Basanti's Foley catheter was ever removed to assess her ability to void.  Thus, Dr. Beagle's finding that Ms. Basanti had no difficulty voiding is not credible.  *Supra* Finding of Fact No. 88.  Dr. Beagle's apparent reliance on the neurological examination conducted in the ER is troublesome given the lack of evidence that she made her own neurological findings.  Dr. Beagle also admitted that spinal cord compression should be considered when a patient was unable to void, suffering from new right leg weakness, prior left leg weakness and sensory changes.  *Id.*  Dr. Deutchman admitted that Dr. Beagle did no further workup on spinal cord compression.  *Id.*

In hindsight, it appears that Ms. Basanti's cyst caused her condition to progress from leg numbness and weakness to complete paralysis in roughly 24 hours.  Plaintiff fails to show that a reasonable family physician would have perceived that paralysis could occur in such a short window under the circumstances present on October 27.  There is no indication that spinal cord compression regularly causes so rapid a progression such that, even if Dr. Beagle believed a thoracic MRI was warranted, the standard of care required a thoracic MRI to be conducted on an emergent basis.[57]  Dr.

---

[57]Dr. Tolge testified that a compressive lesion typically causes a slower progression of deficits than Ms. Basanti complained of and that a three day rapid progression of symptoms is not a typical presentation for a compressive lesion.  *Supra* Finding of Fact No. 99.a.  Dr. Rauzzino testified that symptoms of spinal cord compression are generally progressive and that, for Ms. Basanti to be able to retain any function during the relevant time period, her cyst was likely growing very slowly.  *Supra* Finding of Fact No. 23.

Deutchman consistently testified that the CT scan and lumbar MRI were reasonable efforts under the circumstances to determine whether Ms. Basanti's symptoms had a neurologic origin. *See supra* Finding of Fact No. 88.b. Tellingly, Dr. Huffman did not directly criticize the fact that Dr. Beagle visited Ms. Basanti just once on October 27. Were a compressive lesion reasonably likely to cause rapid paralysis, one would expect the expert witnesses in this case to criticize Dr. Beagle for failing to reexamine Ms. Basanti or arrange for the on-call Salud physician to check her neurologic function during the night. Plaintiff elicited no such testimony. Given the atypical presentation of Ms. Basanti's compressive lesion, the Court cannot, in the absence of expert testimony on the issue, find that a reasonable family physician would have thought the urgency of ruling out a compressive lesion in the thoracic spine so great that a thoracic MRI would have been ordered and conducted on October 27, in time to prevent paralysis.

More so than other physicians, the examination of Ms. Basanti performed by Dr. Tolge provides an important perspective on the degree to which the Salud physicians should have analyzed the symptomology and medical history to conclude that an MRI of the thoracic spine was needed. Dr. Tolge is a board-certified neurologist, who has been practicing in the field of neurology for more than twenty years. When Dr. Tolge examined Ms. Basanti, her neurological condition was much more serious than when any of the Salud doctors saw her on or before October 27. Ms. Basanti had no sensation in or motor control of her legs and was paraplegic in the lower extremities. She had no sensation of bladder fullness. *See supra* Finding of Fact No. 99. After reviewing the medical records and noting that cranial and lumbar MRIs were essentially normal for a person plaintiff's age and learning from plaintiff that left leg numbness had

began a month earlier and right leg numbness three days earlier, Dr. Tolge made the following assessment: "Rapidly progressive ascending lower extremity sensory motor impairment with sphincteric disturbances, very concerning for Guillain-Barre with autonomic dysfunction.  Consider compressive myelopathy or transverse myelitis in differential but consider these less likely."  Ex. 5, p. MCA000029.  Dr. Tolge, a neurologist examining Ms. Basanti in a paralytic condition and armed with information regarding the history of Ms. Basanti's condition, focused first on Guillain-Barre and determined that a compressive spinal lesion was less likely.  The Court recognizes that neurologists and family practice physicians are subject to different standards of care. *See Hall*, 190 P.3d at 858-59.  Nonetheless, neurologists are generally more experienced than family physicians at recognizing and diagnosing neurological problems.  The fact that an experienced neurologist examining Ms. Basanti in an acute neurological condition directly implicating a spinal cord problem did not consider a spinal lesion to be likely makes it more reasonable that the Salud physicians, based on far less obvious symptoms, would not have ordered a thoracic MRI to rule out the possibility of a compressive lesion.

Although Dr. Beagle did not in all instances act as a reasonable family physician, for the foregoing reasons, the Court cannot conclude that Dr. Beagle's breaches of the standard of care caused plaintiff's injuries and therefore render her liable for Ms. Basanti's injuries.[58]

---

[58]Dr. Huffman's suggestion that all of the breaches of the standard of care he identified during his testimony led to a delay in the correct diagnosis is, for the foregoing reasons, similarly unsupported and insufficient to hold Dr. Beagle liable.

## III. CONCLUSION

There is uncertainty surrounding Ms. Basanti's condition during the relevant time period. The physicians who treated Ms. Basanti prior to her becoming paralyzed have little to no independent memory of Ms. Basanti's visits. Ms. Basanti and her family members provided little indication of how her symptoms progressed, let alone what symptoms were present but undiscovered during visits with the Salud physicians. No expert witnesses indicated, to a reasonable degree of medical certainty, what specific symptoms Ms. Basanti's cyst would have caused and when such symptoms would have manifested. This leaves the medical records as the primary source of information and, as discussed at length, it is difficult to infer the presence or absence of a particular medical finding based upon the presence or absence of a particular finding in the records. It is harder still to say, with the necessary certainty, what findings would have been discovered had more complete histories or more complete physical examinations been performed.

The appropriate course of treatment in this case is beyond "the realm of lay knowledge and experience" and expert testimony is therefore required. *Melville*, 791 P.2d at 387. Plaintiff did not establish through expert testimony that the standard of care required Dr. Robinson, Dr. Rufner, or Dr. Beagle to order a thoracic MRI. As a result, plaintiff was required to show that, had the Salud physicians acted as reasonable family physicians, the appropriate course of treatment would have been altered in such a way that a thoracic MRI would have been conducted in time to remove the cyst and prevent at least some of Ms. Basanti's injuries. However, the expert testimony in this case did not illustrate, and the Court cannot speculate as to, what the appropriate

course of treatment would have been had the various breaches not occurred.  Thus, the Court has no basis upon which to determine how, if at all, certain substandard conduct of some Salud physicians changed the outcome.[59]

Ms. Basanti has the extreme misfortune of having a rare cyst in her thoracic spine compress her spinal cord to the point of paralysis.  Ms. Basanti will never again be able to walk or care for herself without assistance.  Although some of Ms. Basanti's treating physicians from the Salud Clinic in some instances fell below the standard of care, there is insufficient evidence upon which to conclude that the Salud physicians caused a delay in the diagnosis of Ms. Basanti's spinal cord cyst.  As a result, the United States cannot be held liable for any damages suffered by Ms. Basanti.[60]  It is therefore

**ORDERED** that judgment shall enter in favor of the United States and against plaintiff.  It is further

**ORDERED** that the government's Motion Pursuant to Fed. R. Civ. P. 52(C) for Judgment on Partial Findings Relating to the Claim Against Dr. Kelet Robinson [Docket No. 346] and plaintiff's Motion for Judgment as a Matter of Law Regarding Causation

---

[59]The Court did not declare the jury advisory pursuant to Fed. R. Civ. P. 39(c) and has arrived at this conclusion through an independent review of the evidence.  *See Engle v. Mecke*, 24 F.3d 133, 136 (10th Cir. 1994) (holding that parallel jury determination has no binding effect in an FTCA action).  Nonetheless, it is worth noting that the jury was asked to apportion fault among all defendants pursuant to Colo. Rev. Stat. § 13-21-111.5 and found that, while the United States was negligent, such negligence did not cause any damages to plaintiff.  *See* Docket No. 372-1 at 2.

[60]The Court therefore need not, for purposes of Colo. Rev. Stat. § 13-21-111.5, determine whether Dr. Metcalf or Dr. Rozeski should be attributed a percentage of fault.

[Docket No. 368] and Motion for Judgment on Partial Findings [Docket No. 369] are

**DENIED** as moot.  It is further

      **ORDERED** that this case is closed.


      DATED February 26, 2015.

                            BY THE COURT:


                            s/Philip A. Brimmer
                            PHILIP A. BRIMMER
                            United States District Judge